In the Matter of George Thomas Perkins, Jr., George Thomas Perkins, Sr., Appellant, v. Thomas J. Brownlee and Kathryn Sutor Brownlee, his Wife, Respondents.—117 S. W. (2d) 686.

St. Louis Court of Appeals. Opinion filed June 7, 1938.

*Clark M. Clifford* for appellant, George Thomas Perkins.

*William W. Crowdus* for respondents.

BENNICK, C.—This is an appeal by the natural father from the decree of the Juvenile Division of the Circuit Court of the City of St. Louis sustaining the respondents' petition for permission to adopt his minor son.

. With the father not consenting to the adoption but instead, opposing it with all the force at his command, the chief issue at the hearing below was whether he had neglected to provide proper care and maintenance for his child for the two years last preceding the date of the filing of the petition. Under the statute (Sec. 14074, Revised Statutes of Missouri, 1929 [Mo. Stat. Ann., sec. 14074, p. 823]) this is one of the contingencies which dispenses with the necessity for obtaining the consent of a parent of a child as a condition to the court's right to decree its adoption by a person or persons petitioning therefor.

The appellant is Dr. George Thomas Perkins of San Antonio, Texas, while the petitioners are Thomas J. Brownlee and Kathryn Sutor Brownlee, his wife, who reside in the City of St. Louis. Mrs. Brownlee was formerly the wife of appellant, and it was of their marriage that the child in question, George Thomas Perkins, Jr., was born. Subsequently Dr. Perkins obtained a decree of divorce from his wife under circumstances which will presently appear; and thereafter she married Mr. Brownlee, with whom she has joined in this proceeding for the adoption of George Thomas Perkins, Jr., as their child.

The evidence discloses that appellant and Mrs. Brownlee were secretly married on April 23, 1929, while both were students at Washington University in the City of St. Louis. Appellant was enrolled in the dental school, preparing himself for the dental profession so that upon his graduation he might become associated with his father who was a practicing dentist in San Antonio. Mrs. Brownlee was then Kathryn Sutor, the daughter of Mr. and Mrs. D. M. Sutor, who reside within the metropolitan area of the City of St. Louis.

Upon appellant's graduation from the university in June of 1929 he at once entered upon the practice of his profession in San Antonio, while his wife remained in St. Louis for the time being without the fact of their marriage having been revealed. However he shortly came back to St. Louis for a formal wedding which was arranged, and at the conclusion of this his wife accompanied him to San Antonio where they furnished an apartment and set up housekeeping with the expectation of making San Antonio their permanent home.

It appears that when appellant first started up in practice he was quite successful and did well financially, but that the depression soon came on, causing his practice to fall off and his earnings to be materially decreased. Indeed the business decline beginning with the fall of 1929 is a matter of current history, and appellant was unfortunately in a position to feel its effect almost immediately on account of indebtedness he had been compelled to incur at the very outset of his career in connection with the purchase of furniture for his apartment and dental equipment for his office. Then on December 2, 1930, his son, George Thomas Perkins, Jr., was born, and with the family expenses thereby increased and appellant's obligations to

his creditors becoming steadily more difficult to meet, the point was soon reached where both young people came to realize that some drastic step would have to be taken if appellant should hope to get out from under the burden of his debts.

The decision arrived at, even according to Mrs. Brownlee's own testimony, was "that it would be better if I would go home on a visit and take the baby with me, and that we break up housekeeping, and he (appellant) stay with his family until he got his debts paid."

With this in view appellant wrote Mr. Sutor on February 17, 1931, informing him of the conclusion that he and his wife had come to, and asking for Mr. Sutor's opinion in the matter so that if the plan met with his approval the necessary arrangements could be made to put it into effect. He also advised Mr. Sutor that he had taken up with his local bank the matter of negotiating a loan in order to enable him to take care of his debts of long standing, and had been told that the indorsement of two property owners would be required upon his note. His own father was to be one of his indorsers, and he inquired of Mr. Sutor whether he would do him the favor to be the other one. Appellant's idea was that if both he and his wife should return to their respective parents' homes for the time being as they had mutually agreed to do, the resulting reduction in his current expenses would enable him to pay off his loan at the bank at the rate of $100 a month.

Mr. Sutor replied to appellant's letter, graciously advising that he would be more than glad to have his daughter and grandson come into his home and remain as long as necessity should demand, but cautioning appellant that once the step was taken, it would be necessary that appellant should permit them to remain "without complaint and without fuss" until such time as he might be able to get his affairs in shape. He also stated that while he expected appellant to provide for their transportation to St. Louis, after they reached St. Louis he (Mr. Sutor) would "take care of them for their living and necessitites." As regards the matter of the loan from the bank, he informed appellant that he would be willing to go on his note for a sum not to exceed $800, and also stated that he regarded appellant's plan as a very wise one, and one which many men in his position and at his age would not have the courage to undertake.

On February 25, 1931, appellant again wrote Mr. Sutor, informing him that the bank had refused the loan upon the ground, among others, that it did not make loans that were to be paid in installments, but advising that his wife would come to St. Louis as planned some time around the middle of March. He then stated that "the visit will do her good I know but as for Tommie he will probably miss playing with his old Dad. For every afternoon when I go home we always have a friendly fight. He's a rowdy little devil for he kicks and moves his mitts around like nobody's business." With regard

to his financial affairs, he expressed his thanks to Mr. Sutor for having been willing to go on his note, and promised that even without the loan from the bank he would "plug away" and pay off his debts as fast and as best he could.

On March 7, 1931, Mrs. Brownlee and the baby came to St. Louis, but with the understanding, as she herself admitted, that they were to come "only for a visit," and that "we were to visit my parents and that I would then return to him with the child." This is of importance as evidencing the fact that her coming to St. Louis was in nowise due to any claim of misconduct on appellant's part, nor is there the least intimation in the record that appellant did not at the time sincerely desire and expect her to return to San Antonio after a few months so that they could resume their normal family relations after he had had the opportunity to put his affairs in shape.

One June 29, 1931, appellant sent his wife a check for $10 which she returned to him the following July 20th, advising him that her father had given her whatever money she needed, and suggesting that appellant use the money to buy himself "some much needed pajamas." This letter, which was written in an affectionate tone, was replete with news of Tommie and his "first tooth," and concluded with her praise for appellant's effort in having cleared up so many of his debts "in one bunch."

On August 5, 1931, appellant sent his wife a check drawn to the order of Mr. Sutor, but with the amount left to be filled in, which check, according to Mrs. Brownlee's own testimony, was "to cover expenses." Two days later she returned the check to appellant with a letter in which she advised that after having thought the matter over she had concluded that "until the future is definitely settled" they should go on as they had, with Mr. Sutor giving her whatever money she might require. In that connection she stated that "after we see how things turn out you can reimburse Daddy then."

Mrs. Brownlee admitted that after she had been in St. Louis for a short period appellant began importuning her by letter and telephone to return to San Antonio with the baby, and that finally, in September or October of 1931, she informed him that she "was not going to return to San Antonio at all." In view of the finality of her decision appellant made no further efforts to induce her to return, but on October 19, 1931, brought an action for divorce in the 37th District Court of Bexar County, Texas, which was evidently the venue in which he resided.

Mrs. Brownlee also admitted that although she was duly served with summons in the action, she filed no answer, and did not go down to Texas for the hearing.

The record does not show the ground or grounds upon which appellant based his action for divorce, but it does disclose that in his petition he alleged that he was able and anxious to have the custody

and control of his child, and prayed that the child's custody be awarded him.

It appears that after the divorce action was instituted Mrs. Brownlee employed counsel both in St. Louis and in San Antonio with whom appellant's counsel proceeded to take up the questions of property settlement and custody of the child. No difficulty was encountered with respect to the adjustment of the property rights of the parties, but not so with the question of custody. It was of course understood by all the parties that with the child outside the jurisdiction of the court the matter of his custody and maintenance could not be adjudicated by the decree, but it was hoped that some agreement could be reached between appellant and his wife whereby the question of the child's future custody and maintenance could be disposed of.

With this in view, negotiations were carried on between the respective attorneys employed in the case, but all to no avail. Appellant appreciated the fact that the child, which was then less than one year of age, could not at that time be taken away from its mother for any period, but it was his desire that a definite agreement might be reached as to his right to visitation and part time custody when the child should arrive at an age when it could be separated from its mother. No agreement could be reached between the parties, and with Mrs. Brownlee insisting upon her right to ''full possession'' and not assuring appellant that he could have custody of the child at any future time, appellant refused to enter into any definite agreement respecting the question of the child's maintenance. However this does not mean, as we read all the evidence, that appellant was in anywise repudiating his obligations to the child, but only that he was unwilling to enter into a stipulation with his wfe with respect to the maintenance feature of the case unless the stipulation should cover the question of future custody as well.

On December 23, 1931, the court rendered its decree adjudging that appellant be divorced from his wife, but specifically refraining from any order as to the custody of the child which was not within the jurisdiction of the court.

Notwithstanding the divorce and all the controversy that had arisen in connection with it, appellant sent his son a box of toys for Christmas, 1931, and then at Easter, 1932, sent him a suit of clothes.

In November, 1932, appellant paid a visit to St. Louis, at which time he conferred with his former wife regarding the support of the boy who was then two years of age. According to her own admission, Mrs. Brownlee demanded the sum of $50 a month, which appellant informed her was ''out of all reason,'' and with which conclusion we think most persons would agree, the age of the child and the circumstances of all the parties considered. Appellant's financial condition was then about the same as it had been in 1931, and while

his income did not permit him to accede to his former's wife demand for an allowance of $50 a month, he assured her that he would make any contribution he could if a definite understanding could be reached.

On the child's birthday in 1932 appellant sent him a coat with leggings and hat, which proved to be too small, and which Mrs. Brownlee returned to appellant, advising him that it would be better if she should be allowed to buy the child's clothing in St. Louis.

On December 21, 1933, appellant again wrote Mrs. Brownlee, requesting her advice as to what the boy might need or want for Christmas. In a postscript to his letter he added that "there is much more I should like to say which would weave itself about you two— but perhaps it's best that I don't." Her reply, which was not written until the following January 8th, was that Tommie had had a very happy Christmas; that every one had been very generous to him; that he had received so many toys that she had put some of them away for the present; and that for such reason she would suggest that appellant not send him any toys or clothes, of which he had enough.

On March 23, 1934, Mrs. Brownlee was married to her present husband, Thomas J. Brownlee, who is successfully engaged in the insurance business in the City of St. Louis, and who was admitted to be "a person of good character and good reputation." Indeed appellant admits in his brief that "as far as the character of Mr. and Mrs. Brownlee is concerned, no question is raised, as they are known to be persons of good character and standing in the community." While we find no corresponding admission in respondents' brief, the fact remains that there was no attempt whatever to assail appellant's character or reputation at the trial as we should think that there would undoubtedly have been if he had been in least vulnerable to any such attack.

In June, 1934, appellant paid a second visit to St. Louis, but what, if any, discussion was had between him and Mrs. Brownlee on that occasion, the record does not disclose.

In November, 1934, appellant gave up the private practice of his profession upon receiving a commission as a captain in the dental corps of the United States Army. The following month he too remarried, and he and his present wife now live in comfortable surroundings in a house situated adjacent to the military reservation in San Antonio. His captain's pay is $316 a month, and the position is a permanent one which carries with it no doubt the normal possibilities for promotion in rank, with the attendant increased income.

On the child's birthday in 1934 he received a telegram from his father wishing him a happy birthday, and at Christmas of that year appellant sent him a cowboy suit.

On July 31, 1935, appellant wrote Mrs. Brownlee, again expressing his hope that they could arrive at some definite arrangement in re-

gard to their son's future, and stating that he felt the time had come when the boy should begin to know his own father. Calling attention to the fact that he had seen his son but three times during the more than four years that Mrs. Brownlee had had him with her in St. Louis, he inquired if she did not think it fair that he should have the child visit with him part time each year, but with the length of the visit to be left to Mrs. Brownlee's wishes in the matter. Again he assured her of his desire to discuss the matter of sharing in the boy's financial support. He concluded his letter with a plea that Mrs. Brownlee would break down the bars and write him all the little intimate details about the boy, his weight, his height, the color of his hair, and if she had a snapshot available, to send that along, which "too would be most kind."

On August 12th, Mrs. Brownlee replied briefly to his letter, giving certain details of the boy's appearance, but omitting all reference to the subject of his maintenance, or to any question of his adoption which she and her present husband must even then have had in mind in view of the fact that they filed their petition for adoption only four days later, or on August 16, 1935. When it was that summons was served upon appellant does not appear, but it was shown that on August 26, 1935, he again wrote Mrs. Brownlee, thanking her for the picture of his son, and reminding her that she had neglected to express herself with reference to his request that he be permitted to have the child with him from time to time for whatver period might be agreeable to her. This letter she did not answer, and so the matter stood until December 27, 1935, when the adoption case was called up for hearing in the local circuit court.

In their petition, which was filed by Mr. and Mrs. Brownlee jointly, they alleged, among other things, that appellant had contributed nothing to the support of the child since December 23, 1931, which was the date of the entry of the decree of divorce in the Texas court, and then prayed "that they be permitted to adopt the said George Thomas Perkins, Jr., to all legal intents and purposes as though the said child be the child of your petitioners, and that the court order and decree that said George Thomas Perkins, Jr., shall henceforth be regarded and considered as the child of your petitioners as though born to them in lawful wedlock; that they be granted custody of his person, and that the name of said child be changed to Thomas Donald Brownlee."

In asking for the change in the child's given names respondents' purpose was to have him bear the name "Donald," which was Mr. Sutor's given name, and (we would surmise) thereby dispense with the name "George," which was the name by which appellant was known.

Along with the petition was filed Mrs. Brownlee's written consent in which she set up that she was the mother of the child, and expressly

consented "to the adoption of the said George Thomas Perkins, Jr., a minor, by Thomas James Brownlee and Kathryn Sutor Brownlee, his wife."

Appellant's answer was a general denial, followed by an averment that Mrs. Brownlee, being the natural mother of the child, might not adopt him as her adopted son; that Mrs. Brownlee had left San Antonio with the ostensible purpose of only visiting her parents in St. Louis, but had thereafter refused to return with the child to San Antonio; that Mrs. Brownlee had at all times refused appellant's offers of support for the child while she had the child in her custody in St. Louis; that appellant was then, and at all times had been, ready, able, and willing to support his son; and that he did not consent to the child's adoption by respondents, but instead objected to the adoption or to any change in the name of his son.

In its decree the court found that for a period of more than two full years last preceding the filing of the petition appellant had neglected to provide proper care and maintenance for the child, and that the latter's welfare would be promoted by sustaining the petition for adoption. The adoption was therefore ordered with the change of name as prayed in the petition; and from the judgment so entered appellant's appeal to this court has followed in the usual course.

The burden of appellant's complaint is that the court erred under the facts and circumstances of the case in sustaining the petition for adoption.

In this case, as we have already pointed out, there is happily no question of the moral fitness of respondents to have the custody of the child, nor is there any question of their ability and willingness to properly care for, maintain, and educate it. It is not claimed that the child's temporal welfare would suffer by the adoption, and indeed the decree brings no change in the child's actual environment and surroundings. But neither was it shown that the child's welfare would suffer by permitting it to retain its natural *status* as the child of appellant, so that the real issue in the case is that of whether appellant may be said to have forfeited his right to insist that such natural *status* be maintained.

Adoption proceedings being statutory, there is always the question of how the statute shall be construed, with the answer usually depending upon the angle from which the subject is approached. It is of course true that the statute is to be liberally construed with a view to promoting the best interests of the child, but such liberal construction is obviously not to be extended to the question of when the natural parents may be divested of their rights to the end that all legal relationship between them and their child shall cease and determine. Conceding that the State, in its role of *parens patriae*, may, where the circumstances warrant, provide for the adoption of a

child even as against the consent of its natural parents, yet it must always be borne in mind that the rights of natural parents to the custody and possession of their children are among the highest of natural rights, and being so, are not to be interfered with by the State except where it clearly appears that the natural parents have forfeited their rights by their own misconduct and that the child's best interests will be served by allowing it to be adopted by some one else. Consequently it is uniformly held as a simple matter of natural justice that adoption statutes are to be strictly construed in favor of the rights of natural parents, and that when controversy arises between natural parents and those who seek to destroy their parental *status,* every reasonable intendment is to be made in favor of the formers' claims. [1 Am. Jur., Adoption of Children, sec. 9; 2 C. J. S., Adoption of Children, sec. 6.]

In fact, so scrupulously does our statute regard the rights of natural parents that it provides (sec. 14074, *supra*) that the court may not decree the adoption of any minor without the written consent of its parents, save only in certain excepted situations among which is the case where the parent has "neglected to provide proper care and maintenance for the two years last preceding" the date of the filing of the petition for adoption. As we pointed out at the outset of the opinion, it is upon such provision that respondents count in the case at bar as the basis for the court's right to have sustained their petition over appellant's objection to the adoption, and so we come to the question of whether, when the statute is strictly construed in support of appellant's rights as a natural parent, he may fairly be said to have neglected to provide proper care and maintenance for his child for the two years last preceding August 16, 1935, the date when respondents' petition was filed in the local circuit court.

Now there can be no denial of the fact that during such period of time appellant did not actually provide for the child's support and maintenance, and indeed he admits that he did not do so. However it does not follow that his rights as natural parent were thereby forfeited unless we may hold that he "neglected" to provide proper care and maintenance within the meaning and contemplation of the statute.

Many words have various shades of meaning in legal usage, and the same is true in the case of the verb "neglect." In some instances it may imply a mere failure or omission to do something without regard to the gravity of the reasons which prompted the failure to act, while in other instances it is used in the sense of a designed refusal or unwillingness to perform one's duty with respect to a matter with which one is charged with the duty to act. [45 C. J. 606.] We think that the word is unquestionably used in such latter sense in the statute now under consideration, and while the lower court would seem to have entertained a different idea, we think that under

a fair grammatical construction of the statute the adverb "willfully" modifies the verb "neglected" no less than it does the verb "abandoned." But whether this is the proper grammatical construction of the clause or not, the statute obviously contemplates the same result, and the parent's consent to the adoption is not to be dispensed with upon the ground of his neglect of his child unless it is shown that such neglect was intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego his parental duties over the period of time which the statute prescribes. It is inconceivable that the Legislature would have had anything less in mind with respect to a matter of such serious consequences, and certainly nothing less would warrant the State in assuming to sever the natural relationship which exists between a parent and his child.

In this case we think the evidence clearly refutes any idea that appellant's failure to have provided care and maintenance for his child for the two years preceding the filing of the petition for adoption was due to willful neglect on his part so as to have amounted to a forfeiture of his right to insist that he be, allowed to continue to be the father of his child. All parties agree that the breaking up of the home in San Antonio was mutually intended to be but temporary, and that when appellant permitted the child to be brought to St. Louis he did not in anywise relinquish his parental claims. Mrs. Brownlee was laboring under no misapprehension on that score, and she admits, no less than does appellant himself, that the understanding was that she and the child should shortly return to San Antonio.

She now makes much of the fact that appellant did not live up to the letter of his bargain with Mr. Sutor, but instead began to importune her to return with the child before his debts were all completely paid. We think that this is no doubt true, but since when has it become reprehensible for a husband and father to desire the company of his wife and baby, even though it may involve the repudiation of an agreement with his father-in-law respecting their temporary separation? And since when has a father's yearning for his son become a legitimate link in the chain of circumstances that would warrant a court of justice in decreeing the adoption of his son by some other man?

There is one thing that Mrs. Brownlee seems to forget, and that is that so far as this record discloses it was she who was responsible for the final separation when she advised appellant, not that she would not return to San Antonio until his debts were paid, but that she "was not going to return to San Antonio at all." If she had a defense to his subsequent action for divorce, she did not see fit to assert it, and by virtue of the decree, which she did not oppose, appellant stands adjudged to have been the innocent and injured party.

So in construing the question of whether appellant neglected to provide proper care and maintenance for his child within the con-

templation of the statute, we may not disregard the circumstances under which the child was retained by its mother in St. Louis. Appellant did send two checks for the child's support, both of which Mrs. Brownlee returned to him with the advice that for one reason or another no contributions from him were then desired. Every one knows that so long as she was living with her parents, and even more so after her second marriage, appellant could not obtrude himself upon her without her consent and approval. He was at all times insistent that some agreement be reached regarding his support of the child, but the only proposition Mrs. Brownlee made was one which was not only unreasonable, but beyond his financial ability to meet. However he nevertheless continued to recognize his parental *status*, and even after the petition for adoption had been filed was still calling her attention to the fact that she was not replying to his inquiries regarding the contributions that he might make.

It would appear that what unquestionably happened was that after the child had reached an age where appellant could not be put off indefinitely and it was becoming increasingly evident that the court might shortly be called upon to render an adjudication with respect to the child's custody as between its parents, respondents instituted this proceeding with the hope that they might thereby have all legal relationship between appellant and the child determined. The announced purpose of our adoption statute is to provide homes and proper nurture, education, and training for children who have lost their parents, or for children whose parents, because of misfortune or improvidence, are unable to properly rear and educate them. [Shepherd v. Murphy, 332 Mo. 1176, 61 S. W. (2d) 746.] It was never intended to supplant the jurisdiction of courts to adjudicate the custody of children as between parents who are living apart, and conceding the affection of respondents, for the child and their genuine interest in its welfare, they may not have recourse to the statute for any such unauthorized purpose.

With the conclusion inescapable on the record before us that appellant has not forfeited his right to object to the adoption, there is no occasion to consider other questions presented such as that of Mrs. Brownlee's right to become an adopting parent of her own natural child.

The Commissioner accordingly recommends that the judgment rendered by the circuit court be reversed and the cause remanded with directions to the lower court to enter up a new decree denying the petitioners the relief they ask and dismissing their petition.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly, reversed and the cause remanded in accordance with the recommendations of the Commissioner. *Hostetter, P. J.,* and *McCullen, J.,* concur; *Becker, J.,* not sitting.