435 S.W.2d 35 (1968)
In the Matter of the ADOPTION OF Mark Russell George RULE, a minor.
Robert L. SIEMER and Caroline B. Siemer, Respondents-Petitioners,
v.
Gallagher RULE, Appellant-Defendant.
No. 25000.
Kansas City Court of Appeals, Missouri.
December 2, 1968.
*36 Robert E. Coleberd, Wayne Kuhlman, Liberty, Hale, Coleberd, Kincaid & Waters, Liberty, of counsel, for appellant.
*37 Louis Lombardo, Kansas City, for respondents.
MORGAN, Judge.
This case involves the appeal of a natural father to have set aside a decree of adoption of his son by the present stepfather of the child. The decree entered in the Juvenile Division of the Circuit Court of Clay County, Missouri, sustained the petition of Robert L. Siemer and Caroline B. Siemer, husband and wife, to adopt Mark Gallagher Rule, now 12 years of age, who was the son of defendant, Gallagher Rule, and petitioner, Caroline B. Siemer, by their previous marriage.
All of the parties were present at the hearing and the record reflects those circumstances leading to the present controversy. The mother was a native of Milwaukee, Wisconsin, and she and the natural father were married there on December 23, 1950. They suffered the tragic loss of their first child when he fell from a fifth floor window of an apartment house at the age of approximately 2 years. Mark, now 12 years of age, is the sole remaining child of this marriage. By a decree of the Circuit Court of Milwaukee County, Wisconsin, the natural parents were divorced on December 19, 1958. The mother, as plaintiff, obtained the divorce, and although designated by the decree as a default proceeding, the father was represented of record by counsel. In view of the decree providing a detailed division of the properties, both real and personal, it appears to incorporate either a prior property settlement or at least an agreement of the parties for such a division. It provided the mother was to have custody of Mark, then 2 years of age, with the father to have the usual rights of visitation. The father was to pay the mother $50.00 per month for child support. Only one other provision is of interest here. It provided that the mother was to take title to a jointly owned residence with the father to have an equitable lien thereon to assure payment to him of $1,500.00, which represented a portion of their equity. This payment was to be made when the house was sold or in any event within two years of the divorce.
Both of the parties are now remarried The father remarried in December, 1959, and his wife is a native of Zurich, Switzerland. They have no children and live on a farm in Oklahoma near the Kansas line with their address being Arkansas City, Kansas. The mother married the petitioner, stepfather, in September, 1962. One child has been born to this marriage and they are residents of Clay County, Missouri.
The natural father is a graduate of Marquette University with a major in Philosophy. He did not have a degree in engineering, but estimated approximately 3 years of his education at both Marquette and Oklahoma State University pertained to engineering. His experience also included service in the U.S. Marine Corps and he is a Major in the reserve. His employment from 1958 to 1966 was in the field of engineering with a firm manufacturing papermaking machines and as an electronics maintenance engineer with Bendix Corporation. Except for a training period of several months in Beloit, Wisconsin, his duties required he live in Switzerland, Spain, Turkey, Libya and Chile. During the time he was in the United States at Beloit, and prior to the remarriage of the mother, he visited the child in Milwaukee. Although he testified some appointments for visiting failed because of her absence from the home, and she testified he failed to keep some of the appointments, the conflicts were not too severe and appeared to have been the usual aftermath of a divorce proceeding. He explained it was the policy of his employer to permit employees to return home (United States) one month every two years. After the remarriage of the mother, his first occasion to return was in July, 1963. He testified that after locating the petitioners in Porterfield, Wisconsin, they reluctantly allowed him to visit Mark after he had insisted upon this right. His next return from his overseas assignment was in *38 August, 1965. He assumed the boy was at this time in Paola, Kansas, since his parents had visited Mark there several months earlier. After not finding him in Paola, the father further testified that he mailed a birthday present to Mark at Paola and requested a return receipt. After it came back with a Missouri address, he came to Kansas City and found the address of the petitioners in the telephone book. He and his wife went to the home of petitioners on August 21, 1965, which was a Saturday. Estimates by the parties of the time of their arrival varied from 7 to 10 A.M. Since some of the legal questions raised in this appeal must be resolved around the actions and reactions of the parties on this date, some details are required. The father testified Mark came to the door, recognized them, and invited them inside. They declined and asked that he have his mother come to the door for the purpose of planning a visit. Some 15 minutes later the stepfather came to the door and talked with him. When he asked to visit Mark, the reply was "* * * it was inconvenient." He summarized the further statements of the stepfather as implying there would be no visiting until he "caught up" on child support payments. The father then went to the police station and, after not finding an answer to his problem, returned to petitioners' residence some 30 minutes later. At this time it appeared no one was at home. The stepfather placed their arrival at 8 A.M. and confirmed he had told the father it would be inconvenient and when asked if he explained why, replied, "I didn't feel it was necessary." When asked how the conversation was terminated, he replied, "I just told him that was it, and there was no further discussion; and I walked in the house and closed the door."
The father further testified he then wrote the court in Milwaukee that had granted the divorce. He stated that after explaining that he had complied with the divorce decree and had been denied visitation, "* * * I told them that the only way I had of seeing my son again was to withhold the payments until they felt good enough to let me see my son." After this incident, the father made no further payments, and contributed only "my good wishes, my thoughts, my prayers." Soon thereafter, in May, 1966, he terminated his employment overseas to join his brother and father in a beef and grain farming operation in Oklahoma. He expressed his love for the boy and his continuing desire to have visits with Mark and his hopes that sometime he might be able to have the boy visit with him on the farm. He expressed a willingness to cooperate with petitioners in his efforts to retain his visitation rights. He further testified that he had written Mark on each birthday and Christmas as well as sending presents. The mother said, "There have been several gifts * * *" but recalled only one letter, which she placed in evidence. It was dated July 31, 1967, and indicated an enclosure of $5.00 as a birthday present for Mark and expressed the hope he would take an active interest in the Boy Scouts. He was allowed to see his son the night before the adoption.
We look now to his financial contribution toward Mark's support. The trial court in its finding declared that support payments had been paid up to and including December 1, 1965. This is approximately 7 years after the divorce, and we note by this finding the father was not delinquent when denied the visit in August, 1965. The trial court accepted the father's explanation an agreement had been made to apply the $1,500.00 due him under the divorce decree on the monthly payments.
The mother testified Mark and his stepfather had an excellent relationship, that he had taught the boy to use power tools, worked with him in Cub, Webelos and Tenderfoot scouting, appeared as a father at school functions, taught him to shoot, gave him his golf clubs, assisted in school "home work" and particularly arithmetic, and has been most helpful in times of turmoil resulting from childhood accidents. She recalled it was closer to 7 A.M. when the father *39 asked to visit Mark in August, 1965. She testified she was not dressed at the time and, "I * * * had no reason to go to the door." She testified the father had not written to inquire of the child's welfare.
The stepfather testified he was a graduate of the Naval Academy with a degree in mechanical engineering and had a degree in foreign trade from the American Institute of Foreign Trade in Phoenix, Arizona. He was now engaged as a quality control engineer in a plant of the Ford Motor Company. His base salary and overtime earnings were approximately $1,400.00 a month. He has had an excellent relationship with Mark, and said, "He has become as much a son to me as Gregory." The latter being the son born of his present marriage. He expressed a willingness to support and educate Mark and give him moral and religious training. His two previous marriages had culminated in divorce and at the time of the hearing he was 52 years of age.
The study of petitioners' home required by Section 453.070, V.A.M.S., revealed some additional facts. The stepfather had served in the regular Navy from August, 1933, to August, 1952, and holds the rank of Captain in the inactive Naval Reserve. Prior to his employment the last three years with Ford Motor Company, he was employed six months in Paola, Kansas, and before that time had employment in Milwaukee. He had no church affiliation but when possible attended church with the family. At the time of his first divorce, a child by that marriage was placed in the custody of its mother. No children were born to his second marriage. Petitioners rent a nice home in Clay County.
The petition was filed July 17, 1967, and under the existing facts, as fully outlined herein, the trial court terminated the father's parental rights and decreed Mark to be the adoptive son of the stepfather.
It is our duty to review the record upon both the law and the evidence as in actions of an equitable nature and to reach our own conclusions, after giving due deference to the trial court on questions of credibility, and we are not to disturb its judgment unless found to be clearly erroneous. Section 510.310, V.A.M.S.; Civil Rule 73.01(d), V.A.M.R.; In re Slaughter, Mo.App., 290 S.W.2d 408; In re Adoption of P. J. K., Mo.App., 359 S.W.2d 360.
The father's attack on the trial court's action presents three basic arguments: (1) Sole jurisdiction of the child remains in the divorce court of Milwaukee by virtue of the statutory law of Wisconsin, Section 247.25West's Wisconsin Statutes Annotated, which vests that court granting a divorce continuing authority and jurisdiction over children of divorced parents, (2) The trial court did not have jurisdiction to act without the father's consent because the facts do not show such willful abandonment or neglect of the child as that contemplated by Section 453.040(2), V.A. M.S., (3) The record is devoid of any evidence to show the child's best interests would be served by ordering the adoption because there is no evidence to show the father is unfit to be a parent.
As to the first point, we agree with petitioners' assertion that similar arguments have been rejected by the appellate courts of this state. In the case of In re Adoption of P. J. K., supra, the mother had been awarded custody of the child sought to be adopted by a divorce decree of a court of Texas. At the time of the proceeding she was living with the stepfather and child as residents of Missouri. It was held that the Missouri court had jurisdiction. Under similar facts, our Supreme Court in In re Mayernik, Mo., 292 S.W.2d 562, held, "The decree of the Michigan court determined the legal custody of (the child) as between appellant and her former husband upon facts existent at the time the divorce decree was rendered * * * no question of full faith and credit to the final judgment of a sister state is involved." This proceeding was properly initiated in Clay County and was authorized both by virtue *40 of the authorities cited as well as Section 453.010, V.A.M.S., which provides an adoption petition may be filed in the county of petitioner's residence or where the person sought to be adopted may be. This point is ruled in favor of petitioners.
A more difficult question is presented by the father's contention that the trial court did not have jurisdiction to act without his consent to the adoption. The answer depends on whether or not Section 453.040(2), V.A.M.S. is applicable. It provides: "The consent shall not be required of a parent who has, for a period of at least one year immediately prior to the date of the filing of the petition for adoption, either willfully abandoned the person sought to be adopted, or willfully neglected to provide him with proper care and maintenance."
We have here a case where a father has paid child support for a period of 7 years under circumstances that allowed only limited visitation with the child. Now that he is living nearby and could exercise more normal visitation rights, he has reacted to the treatment accorded him by both the mother and stepfather by withholding payments for approximately 18 months and at this moment has forever lost his son. Although we cannot say his withholding of payments to pressure petitioners into recognizing his status as the natural father of the child might not have been the normal and logical approach of one untrained in the law, we must find it to have been both ill-conceived and poorly advised. His duty to the child is a continuing obligation not affected by the conduct of petitioners. This standoff has lasted more than the relatively short period of 12 months provided by the statute. However, our courts in keeping with the conviction that, "As a matter of simple justice the adoption statutes are to be strictly construed in favor of the natural parent," In re Adoption of J. M. K., Mo.App., 363 S.W.2d 67, have sought to clarify what is meant by "willful abandonment" or "willful neglect." As to abandonment see In re Watson's Adoption, 238 Mo.App. 1104, 195 S.W.2d 331, and as to neglect see In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686; also In re Adoption of J. M. K., supra. In either instance, the conduct of the parent must evidence an intent or mental attitude to forsake the status of a parentat least for the period of time declared in the statute. As stated in In re Adoption of P. J. K., supra, "As in other areas, no two adoption proceedings are presented in the same factual mold; and whether a father's neglect to provide for his child is willful, i. e., intentional, deliberate, and without just cause or excuse, must depend in each instance upon the peculiar facts and circumstances of the particular case at hand." We do not believe the father's conduct in this case justifies a conclusion that he had a settled purpose or intent to forsake his status as a parent. Child support had been paid for 7 years. While such payments were current and after an absence of 2 years, he was coldly and rudely denied even a short visit with his son by the stepfather. The latter's intervention, in any manner, can only be excused in view of the mother's refusal to perform her obligation and cooperate in planning a visit by saying, "I * * * had no reason to go to the door." However, for the purposes of this opinion only, and because we are firmly convinced that our consideration of point 3 must control our decision, we accept the trial court's finding that it had jurisdiction to act without the father's consent.
Point 3 presents the argument that the record is completely void of any evidence that the best interests of the child will be served by terminating his relationship with his natural father and forever making him a legal member of the stepfather's family. This is, of course, the most important factor to be considered. "In all adoption cases the paramount consideration is the welfare of the child." In the matter of the Adoption of J_____, Mo.App., 396 S.W.2d 257. First, if we assume again that the trial court correctly found that statutory neglect contemplated by Section *41 453.040, we are confronted with the question whether or not this fact alone compelled the decree of adoption. Petitioners have not cited nor has our research revealed one case so holding. Such neglect certainly could be a factor to be considered, and under some circumstances, might be the controlling factor. However, the statute cited only purports to give the trial court jurisdiction to act and leaves the paramount question of the child's welfare for the decision of the courts. Such a decision is not to be "* * * employed as a means of punishment and vengeance to the one (parent) and reward to the other." In the matter of D_____ and D_____, Mo.App., 408 S.W.2d 361, 368.
In considering this issue the courts have consistently recognized and sought to preserve the rights of the natural parent. Circumstances may warrant an adoption against the desire of the parent "yet it must always be borne in mind that the rights of the natural parents to the custody and possession of their child are among the highest of natural rights * * *" In re Perkins, supra. Did this father forfeit such right? Absent the use of questionable judgment to pressure petitioners, we do not find anywhere in the record, and particularly including the findings of the trial court, anything derogatory of him. We must assume he is a person of good character, for as stated in Perkins, supra, "* * * there was no attempt whatever to assail appellant's (father) character or reputation at the trial as we should think that there would undoubtedly have been if he had been in the least vulnerable to any such attack."
Petitioners' assertion that the father here acted in a manner parallel to the father in In re Adoption of P. J. K., supra, demands we look at the facts there. That case is clearly distinguishable, because (1) the father never contributed to the support of the child, (2) he had demanded a written property settlement at the time of the divorce which provided, "* * * it is further agreed and understood that the (father) will not be obligated in any way for the payment of child support," (3) the evidence showed his mistreatment of not only the mother but also of the child, and (4) many irritating facts such as keeping the baby bed and preventing the mother's use of it were also shown. All of which went to show his complete lack of interest in his child and the facts there are in no way comparable to the facts of the instant case. We find in 2 C.J.S. Adoption of Children § 21a (1), pp. 383-384, "While the right of the natural parents to the custody of their child is not a proprietary right in the same sense as if the child were a chattel, it has ever been regarded, even in primitive civilization, as one of the highest of natural rights, and the state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. Although there are some decisions which apparently grant or deny the adoption solely on the ground of the child's welfare, it must be noticed that in every case where a parent's protest to the adoption is unavailing, that parent has been guilty of conduct which would make it undesirable for such parent to have the care and custody of the child, and the welfare of the child to be promoted consisted in something more than mere pecuniary advantage." (Emphasis added) We find this conclusion to be consistent with the decisions of the courts of this state. Stockton v. Guthary, Mo.App., 415 S.W.2d 308, 312.
On the other hand, we commend the stepfather for his treatment of Mark and appreciate his possible attachment to him, but no child can be given as a prize solely to compensate for such treatment. We further appreciate it might be more desirable from his standpoint not to have any contact with the natural father, but this was an obligation assumed by him when he married Mark's mother. The boy is now 12 years of age and knows his father. The decree could not change this fact. In the matter of the Adoption of J_____, supra. The mother, not Mark, had divorced the father.
*42 There could be no advantage to this boy in attempting to eliminate his natural father upon whom circumstances may sometime require him to call. We agree that in such cases great freedom of action must be given to the trial court, but we do not believe that the relationship of father and son is so tenuous as to allow its termination without some evidence to show that it would be detrimental to the child not to do so.
The evidence was not so conflicting as to create any question of credibility, nor do the findings of the trial court suggest such, and we are convinced that the evidence does not show it to be in the best interests of this child that he be adopted by petitioners.
The judgment being erroneous is hereby reversed.
All concur.