In the Matter of the ADOPTION OF BABY GIRL DOE.

No. WD 31721.

Missouri Court of Appeals, Western District.

Aug. 11, 1981.

Dale C. Doerhoff, Jefferson City, for appellant Karen Stover; Cook, Vetter & Doerhoff, Jefferson City, of counsel.

Robert L. Hawkins, III, Jefferson City, for Guardian ad litem; Hawkins, Brydon & Swearengen, Jefferson City, of counsel.

Forrest P. Carson, Jefferson City, for respondents-petitioners; Carson, Monaco, Coil & Riley, Jefferson City, of counsel.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

PRITCHARD, Presiding Judge.

The natural mother of a female child, born out of wedlock on January 10, 1976, appeals from an adverse decree of adoption. The petition for adoption alleges that appellant had abandoned the child, but apparently the parties have joined on the issue of whether the natural mother had "for a period of at least one year immediately prior to the filing of the petition * * * willfully neglected to provide [her] with proper care and maintenance." § 453.040(4), RSMo 1978, under which parental consent of the adoption is not required if those grounds are established. A guardian ad litem was appointed to and did represent the child and participated in the proceedings.

When the child was born, appellant chose not to relinquish her for adoption although that was recommended by the Missouri Division of Family Services. Appellant was then 17 years of age and unmarried. When the child was 6 months old, she was placed by appellant in the foster care of respondents who were to keep the child for 3 months for appellant to find a job, transportation, an apartment and a babysitter while she worked. It took appellant longer than she anticipated to arrange her affairs, and thirteen months passed during which the child was with respondents. During that time, appellant visited the child whenever she would call (respondents) and whenever the caseworker said she could come, which was once a week or every other week, and during that time appellant would bring the child "little outfits". Appellant also had the child with her on various weekends. The child's custody was restored to appellant on September 2, 1977, and she thereafter stayed with respondents from time to time. Appellant had a job during that time working from 11:30 p.m. to 7:30 a.m., and felt that respondents were babysitting for her. During June, July and August, 1978, appellant saw the child a lot, taking her home from respondents' home on weekends and occasionally during the week. It was acknowledged by one of the respondents that up to the time that appellant left the state with one Charley, she showed the interest of a mother toward her child. In September or October, 1978, appellant placed the child in a day care center as required by the welfare office, and she stayed with appellant at night in her mother's apartment. Appellant had the primary responsibility for the child's care during that time, providing her with food and clothing. She found, however, that she could not afford the day care center and again left the child with respondents, seeing her about every other weekend until she left Jefferson City on November 26, 1978, with a male companion, Charley. She travelled with him through several states where she worked to support him. It is evident that Charley dominated appellant during that period of time, and did not permit her to return to Missouri, leaving the impression with her that she would be put in jail if she returned or that they would have people after them. Appellant did return to Jefferson City, however, on four occasions, and saw the child on two of them, at respondents' home. She did not contact the respondents on the other two occasions. She was in Jefferson City for one day, one or two days, and on one occasion, for a week. Finally, Charley got put in jail, appellant had a car and some money, so she drove back to her sister's home in Maryville, Missouri, arriving at the end of May or the first of June, 1979. She stayed with her sister a week, then came to her mother's home in Jefferson City. She was told by her family that the welfare office informed them that appellant was not allowed to see the child at that time. Appellant requested a caseworker to allow her to visit the child every weekend, but was advised that it could not be done. She was, however, permitted to visit the child every other weekend.

Upon returning to Jefferson City, appellant got a job at the Holiday Inn as a cashier-hostess, with take-home pay of $180 to $190 every two weeks. She has a chance for advancement.

During the time the child was with respondents, appellant paid them nothing for her care, and they made no request of her for any payment. The welfare office never

did place the child in respondents' home on a permanent basis, or for the purpose of adoption. It was only for temporary care.

Appellant's mother testified that appellant had been living with her after her sojourn with Charley. Before that, appellant was "pretty young and a little bit unsure of herself". Afterwards, she was a very strong person, knowing what she wanted, with a very positive outlook. She always wanted the child. Appellant's sister, who lived with her husband and child in her mother's home, testified that she never heard appellant say that she did not want the child, or that she wanted to abandon her. She had observed appellant feeding, bathing and clothing the child.

■ A number of cases have construed the provisions of § 453.040(4) to the effect that a parent's consent to adoption may not be dispensed with upon the ground of neglect of the child unless it is shown that such neglect was intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego his parental duties over the period of time prescribed by the statute. *In re Perkins*, 234 Mo.App. 716, 117 S.W.2d 686, 692[4–6] (Mo.App. 1938); *Adoption of R.A.B. v. R.A.B.*, 562 S.W.2d 356, 361 (Mo.banc 1978); *In re E.C.N.*, 517 S.W.2d 709, 715 (Mo.App. 1974) [an adoption petition alleging willful abandonment]; *In re Adoption of P.J.K.*, 359 S.W.2d 360, 363 (Mo.App. 1962). It is true, as respondents say, "However, abandonment and neglect are matters of intent and 'evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent....'" *R.A.B. v. R.A.B.*, supra, page 358. But, as noted in *Adoption of Mike and Russ*, 553 S.W.2d 706, 708 (Mo.App. 1977), "'The willfulness of "neglect" ... is more of a negative proposition, simply the failure to perform the duty with which the parent is charged by the law and by conscience. The intent therefore must usually be inferred from the facts and circumstances. Such facts and circumstances would, of course, exclude a finding of willfulness where the neglect occurred because of things beyond the control of the parent and which were not his fault. Consideration must also be given to the words "*proper care and maintenance.*" ...'"

■ Although the decisions in this state have noted that the welfare of the child is an important consideration in adoption cases, there has been a hesitancy in divesting natural parents of their rights. At page 712[3–7] of *In re E.C.N.*, supra, this quotation from *In re Perkins*, supra, is made: "'It is of course true that the statute is to be liberally construed with a view to promoting the best interests of the child, but such liberal construction is obviously not to be extended to the question of when the natural parents may be divested of their rights to the end that all legal relationship between them and their child shall cease and determine.'" See also *In re Fuller*, 544 S.W.2d 345, 349[6] (Mo.App. 1976); and *D.G.K. v. D.G.K.*, 545 S.W.2d 81, 82[2] (Mo.App. 1979).

■ In this case the inquiry is focused upon whether the evidence shows satisfactorily whether appellant *willfully* neglected to provide the child with proper care and maintenance. It is to be noted that the basic period of neglect would be for the year preceding June 13, 1979, when respondents' petition was filed, although appellant's conduct prior to that time may be considered. The child was born when appellant was just 17 years old. Quite apparently, being uneducated and being unable to provide a babysitter or day care for the child, she placed her in the foster care of respondents when the child was 6 months old. But the significant fact is that appellant continued to see the child and have her with her on weekends. Appellant showed the interest of a mother in the child, at least up to the time she left the state with Charley. That act showed foolish and erratic behavior but she was away with Charley only seven months. Upon her return, she attempted to see the child, and was allowed to do so every two weeks during the pendency of these proceedings. Appellant has reestablished herself. She has a job with a promise of advancement. Ac-

cording to her mother, at the time of trial she showed a positive outlook, a strong person, and knew what she wanted. The placement of the child with respondents was due to things beyond appellant's control. *R.A.B. v. R.A.B.*, supra. There is no evidence here of intentional, deliberate neglect "evincing a settled purpose to forego parental duties" for the statutory period. *In re Perkins*, supra. See also the very recent case of *Frederick v. Gottman*, 617 S.W.2d 629 (Mo.App. 1981), which involved custody and not adoption, where the court said, page 636, "If best interest is established by current environmental surroundings and future development of the child, and is supported by the comparative financial and social posture of the parties absent any consideration of the biological nexus of parent and child, this court fears a natural parent could never prevail even though he or she possessed the ·strongest desire to raise, nurture and provide for the child."

The judgment is reversed.

All concur.