In the Matter of Peggy Ann WELLINGTON and Ronald Dwayne Wellington, Petitioners, In Their Petition For The Adoption of Patrick S. Grieshaber, Respondent.

v.

**Arden Leroy GRIESHABER, Appellant.**

No. WD32428.

Missouri Court of Appeals, Western District.

Feb. 23, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 1982

Application to Transfer Denied May 17, 1982.

Jerold L. Drake, Grant City, for appellant.

Roger M. Prokes, Strong, Strong & Prokes, Maryville, for petitioners-respondents.

Scott Ross, Maryville, Guardian ad Litem.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

DIXON, Judge.

Arden Leroy Grieshaber appeals from a decree of adoption of his natural son, Patrick S. Grieshaber, by Peggy Ann Wellington and Ronald Dwayne Wellington, who have been foster parents of the child.

The issue is the propriety of the trial court's order decreeing the adoption without the consent of the natural father on the statutory ground of neglect for more than one year prior to the filing of the adoption petition.

The issue is presented in the context of a factual dispute. In an adoption proceeding, review of such a dispute is under the guidance of Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The law applicable to this dispute is stated in *Adoption of R. A. B. v. R. A. B.*, 562 S.W.2d 356 (Mo. banc 1978), as follows:

Adoption proceedings in Missouri are governed by statute, *In the Matter of D. G. K. v. D. G. K.*, 545 S.W.2d 81, 82 (Mo.App.1976), and while it is often said that the welfare of the child is the paramount consideration in an adoption proceeding, questions regarding the fitness of the petitioners and the child's welfare are not reached if willful abandonment (here neglect) is not proved, *In re E. C. N.*, 517 S.W.2d 709, 712 (Mo.App.1974), because consent or the proper waiver of consent under § 453.040 is jurisdictional, *In re D.*, 408 S.W.2d 361, 365 (Mo.App. 1966). "Willful neglect" as used in the statute has been construed to mean neglect that is "... intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego ... parental duties over the period of time which the statute prescribes...." *In re E. C. N., supra* at 712. The conduct of the parent constituting willful neglect or abandonment must have occurred during the year immediately preceding the filing of the adoption petition, *In Matter of D. G. K. v. D. G. K., supra* at 81–82, and as stated in *In re Adoption of Rule*, 435 S.W.2d 35, 40 (Mo.App.1968): "... the conduct of the parent must evidence an intent or mental attitude to forsake the status of a parent—at least for the period of time declared in the statute...." However, abandonment and neglect are matters of intent and "evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent...." *In re Adoption of K.*, 417 S.W.2d 702, 709 (Mo.App.1967).

*Id.* at 357–58.

Under that scope of review and the applicable law, the issue becomes one of the sufficiency of the evidence to support a finding of willful, intentional neglect on the part of the natural father. The record on this issue is skimpy and fragmented. Based upon all the evidence, the following represents the evidence pertinent to the issue.

*The custody of the child*

Patrick is the son of Arden Leroy Grieshaber and Suzanne Nelson, who were never married. Patrick was born September 1, 1976. In April of 1977, there was an investigation of an alleged child abuse problem. No details are available as to this charge except that Family Services of Nodaway County reported that it was not substantiated and a visit to the home of the natural parents disclosed no difficulty in the case of the child. At that time, there were charges pending against the mother in connection with the forging of prescriptions. On May 22, 1977, the Family Services of Nodaway County received a report of child neglect with respect to Patrick. Patrick had been left with a baby sitter in the home. The mother was to return at 1:00 a. m., and she did not return at all that night. The child was placed in temporary foster care on that date. The child was adjudicated a ward of the Juvenile Court on June 6, 1977. On June 16, 1977, the child Patrick was placed in the home of respondents, the Wellingtons, who now seek the adoption. The natural father was ordered to pay $60 a month for support of Patrick. The natural father and mother separated in June, 1977, the culmination of discord which had begun before the involvement of Family Services in the care of Patrick. The natural father and mother were separated at the time of the incident with the baby sitter and intermittently thereafter to the final separation in June, 1977. The natural mother was sentenced and committed to the Department of Corrections in September, 1977. The natural mother's rights were terminated, and she has not appealed.

The adoption petition of the respondents Wellington was filed July 25, 1979.

*Employment and residence of natural father*

At the time of the placement of the child with the respondents Wellington, the natural father was employed by Robbins Lightning Rod in Maryville. That employment ended in August, 1977. House painting of four to six weeks in Maryville followed, and then he was employed by Montgomery Ward from October, 1977, to February of 1978 and unemployed from March to May of 1978. In May of 1978, he was employed to remodel a business and continued to October, 1978. The natural father claims that he was not fully paid for that work. In November of 1978, he went to work for a telephone cable laying company with headquarters in Oklahoma. This work took him away from Maryville and on November 26, 1978, he was a passenger in a car involved in a one-car accident, which caused him to suffer a broken leg and other injuries. He asserted he was disabled until April of 1979, when he began the employment with Confinement Engineers, in Atlantic, Iowa, 90 miles from Maryville, which continued through the hearing dates. As an inference from the place of the car accident and other references, the natural father has been in Atlantic, Iowa, since December of 1978.

*Involvement of Family Services*

Commencing with the unsubstantiated reports of early 1977, Family Services has been involved in the placement and supervision of the child. The early incidents of neglect were investigated and reports rendered to the Juvenile Court. The Wellingtons asked for foster care of this child and expanded the request to become "licensed" foster parents. In addition to the instant child, the Wellingtons have had custody of other foster children, subject to the supervision of the Division of Family Services. Family Services undertook the obligation of arranging visitation of the natural parents and the enforcement of the support order. Additionally, the investigation of the Wellingtons as adoptive parents was delegated to the Division of Family Services. Some sort of an obligation of counseling the natural parents was also undertaken. All of these conflicting obligations were subsumed under the aegis of the assigned "caseworker." The inherent conflict of these obligations is best demonstrated by specific excerpts from the testimony.

From the testimony of Mrs. Wellington:

Q Now did Leroy at any time request to visit with Patrick when he was denied, when you denied him right to visit?

A When he requested, no. If I denied him it was because the case worker had told us to do so. He hadn't done something with them.

Q Did any situation arise when the case worker told you . . .

A Yes.

Q On how many occasions?

A Twice.

. . . . .

Q Did you have any discussions with Pat, or excuse me, Mr. Grieshaber concerning a set pattern of time when he should come and visit or could come and visit?

A No, it was set up through Family Services.

From the testimony of the original case worker:

A Basically the money, originally in the beginning the money was paid to the Circuit Clerk. I would call monthly at different periods of the month to check to see if the money had been paid. The basic reason for that was to keep up with whether or not Mr. Grieshaber was making payments and also to adjust payments to the Wellingtons if it needed to be adjusted.

Q Adjust for their foster care payment?

A Right, the money that was paid to the Circuit Clerk was sent to the Wellingtons by check and we paid the remainder of the foster care fund.

From the testimony of the second case worker:

Q Now Margaret, I have handed you what has been marked petitioners' Exhibit No. 1, could you identify that for the Court please?

A It is the adoptive home study that I have prepared.

Q Would you like to thumb through the pages to make sure it is all there? Now Margaret this study was based upon a personal study that you performed is that correct?

A Yes and in addition we already had a study that had been completed for the foster home study and then updated each year.

Q O-kay and this is prepared by you and signed by you for under an order issued by Judge Smith, is that correct?

A *I have not received his order at the time I prepared this.*

Other testimony from this witness indicates it was prepared at the request of counsel for the Wellingtons.

*Visitation and support by the natural father*

It appears to be undisputed that the natural father paid only $120 in 1977. The report to the natural father by the Division of Family Services contains the following:

We have received your letter and a cashier's check for $60.00 (for January, 1980). Previous checks have been received as follows:

August, 1979 $120.00 (July and August)
October, 1979 $120.00 (September and October)
November, 1979 $60.00 (November)
November, 1979 $60.00 (December)

During the entire period not including any thwarted attempts at visitation, the natural father had initiated 19 or 20 visits or contacts with his child according to the Division of Family Services records. Some 8–9 of these contacts were after the adoption proceedings were filed. The records demonstrate that the natural father in his contacts with the Division of Family Services has constantly expressed his desire to have the care and custody of his son. Nothing appears in the record by way of an express statement by the natural father that he was abandoning his paternal obligation. The natural father who has married and established a home in Atlantic, Iowa, requested from Family Services a home study report. According to Family Services, Iowa law required a court order. The request was

transmitted to the Juvenile Court by Family Services; no order was forthcoming and no such study was obtained.

Considering all of the foregoing, a firm conviction arises that the trial court was in error in finding "willful abandonment" or "neglect" on the part of the natural father.

The words "wilfully abandoned" have been consistently interpreted since *In re Watson's Adoption*, 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946), to mean

> "... first, a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection." Moreover, "... [t]he abandonment must be absolute, complete, and wilful. There must be a settled purpose to forego all parental duties and relinquish all parental claims...." *In re Adoption of J.*, 396 S.W.2d 257, 261 (Mo.App.1965). See also *In re Adoption of Rule*, 435 S.W.2d 35, 40 (Mo.App.1968).

■ "*Wilful neglect*" as used in the statute has been construed to mean neglect that is "... intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego ... parental duties over the period of time which the statute prescribes ..." *In re E.C.N.*, supra, 517 S.W.2d at 712.

*D__ G__ K__ v. D__ G__ K__*, 545 S.W.2d 81, 82 (Mo.App.1976).

*Murphy v. Carron*, in its application in the instant case, must be applied in the light of the proof required for the necessary finding. The instant case is markedly similar to *D__ G__ K__, Jr. v. D__ G__ K__, Sr.*, supra, and *Matter of Adoption of Baby Girl Doe*, 621 S.W.2d 87 (Mo.App.1981), and the result reached is consistent with that authority. *Cf. Matter of Adoption of Pearson*, 612 S.W.2d 30 (Mo.App.1981), which on the basis of an almost total abandonment for the last three years before adoption and four preceding years of indifference and sporadic visitation and intermittent support reaches the opposite result.

The natural father in the instant case is no exemplar of parental obligation. Like the natural mother in *Baby Girl Doe, supra*, he is uneducated and has demonstrated some erratic behavior. He has, like the mother in *Baby Girl Doe*, shown an interest in his child and has reestablished himself. The original placement of the child in foster care was not due to active neglect on his part, but because the natural mother failed in the custodial responsibility she had assumed. There was undoubtedly friction between the foster parents and the natural father. The Division of Family Services having the divided and conflicting responsibility demonstrated in this case would have been hard pressed to avoid that friction.

The judgment is reversed, and the Juvenile Court is directed to conduct a further hearing with respect to the need for foster care of the child in the light of present circumstances.

All concur.