517 S.W.2d 709 (1974)
In the Matter of E. C. N. et al.
H. J. N. and M. A. N., Petitioners-Respondents,
v.
E. M. N., Intervenor-Appellant.
No. 35580.
Missouri Court of Appeals, St. Louis District, Division One.
December 23, 1974.
*710 Strubinger & Wilbers, L. H. Wilbers, Jefferson City, for intervenor-appellant.
Ralph F. Voss, Linn, for petitioners-respondents.
RENDLEN, Judge.
This is an appeal from decree of adoption by which the parental rights of the divorced natural mother were terminated in a proceeding brought by the natural father and his present wife, stepmother of the adoptive children. The trial court granted adoption of seven children whose ages at that time ranged from seven to sixteen years, and though the case was instituted by a single petition and tried as one case, the court entered separate decrees of adoption for each child. We deem these decrees combined for purpose of this appeal. From the action of the trial court E.M.N., natural mother, brings this appeal.
Except under special circumstances enumerated by statute, consent of the natural mother is required for adoption of children under twenty-one years of age, § 453.030(3), RSMo. 1969.[1] E.M.N. (now *711 married to H.W.) did not consent to the adoption but instead filed her motions in opposition to that proceeding. By her combined "Motion to Intervene and Motion in Opposition of Petition for Adoption" and by her undisputed testimony on this fact, appellant refused her consent. According to her testimony she would not consent to the adoption because she loved the children.
With the mother not consenting, the issue presented is whether she has by her willfull conduct for a period of at least one year immediately prior to the filing of the petition, obviated the necessity of her consent for the adoption. We examine all the circumstances to measure her conduct and from such examination determine her intentions.
Under certain circumstances consent of a parent to adoption is not required as a condition to the court's right to decree adoption. One such circumstance or exception is found in § 453.040(4) for that parent:
". . . who has for a period of at least one year immediately prior to the filing of the petition for adoption, either willfully abandoned the child or willfully neglected to provide him with proper care and maintenance."
The petition alleges appellant had for a period of one year "willfully abandoned the said children" and had "neglected to provide them with proper care and maintenance". There was no allegation of willfull neglect.
Respondent, H.J.N., and appellant, E.M. N., were married July 28, 1956, and seven children were born of that marriage, whose given initials and dates of birth are as follows: E.C.N., June 11, 1957; M.J.N., May 23, 1958; D.G.N., February 6, 1960; M.W.N., March 7, 1961; J.M.N., September 10, 1962; C.K.N., December 3, 1963 and B.J.N., August 17, 1965. Following the separation of the parties in May of 1971, E.M.N. went to Alaska. During the last week of September or the first week of October she returned and visited the children. On these visits she was permitted to see the children only in the presence of the father. From the time of those visits in October of 1971 until the adoption proceeding, June of 1973, she was not given the opportunity to speak with the children alone.
On August 6, 1971, H.J.N. brought an action for divorce and E.M.N. filed answer October 7. On December 2 of that year, the divorce petition was presented by H.J. N. and the court found that defendant's answer was not timely filed, adjudged E. M.N. in default, proceeded on plaintiff's petition, decreed divorce and awarded custody of the minor children to H.J.N. The decree made no provision relative to visitation rights for E.M.N.
On April 22, 1972, H.J.N. married his present wife, M.A.N., and on December 9 of that year they filed joint petition for adoption of the seven children. Their petition contains the allegation that they were without "knowledge as to the actual whereabouts" of E.M.N. and though no issuance or service of process appears in the record on appeal, E.M.N., within thirty days, filed her combined motions asserting her nonconsent and opposition to the adoption. It is curious that petitioners allege they had no knowledge of her whereabouts, when, as we will see from the record, she had been corresponding with the children for twenty months, had been in contact by phone with H.J.N., on occasion in contact with petitioners' attorney and apparently was served at an address provided by petitioners.
In this case it is our duty to review the record, as in actions of equitable nature, upon the law and the evidence, and reach our own conclusions, giving due deference to the trial court on questions of credibility. Unless the judgment is clearly erroneous and in conflict with the clear preponderance of the evidence, it should not be lightly disturbed. § 510.310; Civil *712 Rule 73.01(d), V.A.M.R.; In re the Adoption of Rule, 435 S.W.2d 35 (Mo.App. 1968).
Adoption proceedings are governed by statute, Chapter 453, and this chapter is considered a code unto itself. In re Smith, 314 S.W.2d 464 (Mo.App. 1958). It is well settled that as a matter of simple justice the adoption statutes are to be strictly construed in favor of the natural parent. In re Slaughter, 290 S.W.2d 408 (Mo.App. 1956). Also, adoption statutes, being in derogation of the common law, are to be strictly construed in respect to the forfeiture of parents' rights. In re G.K.D., 332 S.W.2d 62 (Mo.App.1960). The rights of the natural parent to the children are not to be unreasonably disregarded. As stated by this court in In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686, 691 (1938):
"It is of course true that the statute is to be liberally construed with a view to promoting the best interests of the child, but such liberal construction is obviously not to be extended to the question of when the natural parents may be divested of their rights to the end that all legal relationship between them and their child shall cease and determine."
Though the welfare of the child is of primary importance, the court has no authority to decree the adoption to petitioners in absence of the mother's written consent or a showing of a condition defined by the statute as a legal substitute therefore, in this instance willfull abandonment or willfull neglect. Hartwig v. Hartwig, 333 S.W.2d 101 (Mo.App.1960). As stated by the court in In re Adoption of J.M.K., 363 S.W.2d 67, 74-75 (Mo.App.1962):
"`Adoption is purely a creature of statute and even "the best interests of the child" cannot give the court jurisdiction where it has none'. Mo. Law Review, Vol. 27, No. 3, p. 405.
`Questions in regard to the fitness of the petitioners and the welfare of the child are not reached if abandonment is not proved'. 2 Am.Jur.2d, Adoption, Section 60, p. 910."
The petition alleges simply that the appellant "neglected" to provide care and maintenance for the children. This falls short of the statutory requirement of "willfull neglect" contained in § 453.040(4). The statute has been modified to specifically include the adverb "willfully" before the verbs "abandoned" and "neglected". The prior statute was construed to mean essentially the same. See In re Perkins, supra, 117 S.W.2d at 692, in which this court stated:
". . . the parent's consent to the adoption is not to be dispensed with upon the ground of his neglect of his child unless it is shown that such neglect was intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego his parental duties over the period of time which the statute prescribes."
The evidence here was insufficient for a finding of willfull neglect and the court quite properly made no such finding.
We now examine the record concerning the finding of "willfull abandonment". H.J.N. and E.M.N. separated on May 17, 1971, following a stormy period in which each informed the other that they were in love with someone else. E.M.N. had met G.W. and was working for him "so that we could have a little extra on the side for the children". She was informed by H.J.N. that "he was in love with this other woman". E.M.N. testified:
"So I said, `Well, okay,' I said, "I guess it's a turnabout fair.' I said, `I've fallen in love with somebody else, too.' And I asked him for a divorce. And he said, `No.' And I said, `Well, I will leave, then.' And I said, `But I do want to take the children with me.'"
Prior to this time they had had a "constant relationship" with another couple. They went out every Saturday night with the same couple. During those outings, and at *713 the prompting of the two men involved, they changed partners. This resulted in the separation for it was more than E.M. N. could take. Though this less than exemplary behavior is not to be condoned, the undisputed testimony discloses that the misconduct was mutual.
As shown by petitioners' exhibit #8, on May 21, 1971, E.M.N. wrote to the children asserting her love for them and discussing birthday presents, cards, the automobile, the oldest daughter's graduation presents, the childrens' health and similar matters. E.M.N. also admitted she was in love with another man but hoped the children would someday understand and hoped they would love her. Following that letter, E.M.N. received four letters from the children which she answered by hers of August 2, petitioners' exhibit #9. She again explained she did not and had not for some time loved H.J.N., and in response to the apparent request of the children for her to return, she replied that "I can't come back to a man I don't love and haven't for a long time". She reminded the children that they were "just a letter away" and if she could help with some of their problems "just ask". She repeated her love for them and asked that they write and tell her what they needed for school and that she would try to send some clothes before school started. She also requested pictures of the children so she could have and show them.
On August 6 H.J.N. filed his petition for divorce which was served by mail on E.M. N. in Fairbanks, Alaska, on August 9, 1971. In the last week of September or the first of October E.M.N. returned from Alaska to visit the children but was permitted to visit with them only in the presence of their father. On October 7 she filed answer in the divorce proceeding, and on December 9 the trial was held and divorce granted. As we have noted herein, the custody of the seven children was awarded to H.J.N. with no provisions for visitation rights for E.M.N. In the months that followed, E.M.N. wrote to the children on twenty separate occasions. H.J.N. admitted that from October, 1971, to June, 1973, E.M.N. sent birthday cards and letters to each of the children and about half of these letters were returned, marked refused. At Christmas in 1971, E.M.N. contacted R.V., attorney for H.J.N., and requested that he deliver a Christmas box which she had sent for the children. There is some dispute in the testimony as to how this box of presents was refused, but H.J.N. was advised of this effort and was at the home when the presents from E.M.N. were tendered to the children. When R.V. tendered the presents the children were in a room, standing or sitting in a row (their ages at that time were from 6 to 14) and "They were quite young at the time." They would not accept the presents. "All seven of them uniformly shook their heads. Nobody said anything." As R.V. described it:
"At the time I was in no position to tell whether they had been pressured by their father, [or] by the oldest daughters. That is why I asked [E.C.N.] as to whether she pressured the children. I had no way of telling but the children uniformly shook their heads no, that they would not accept the Christmas presents. Later I wrote [E.M.N.] and explained to her what had happened. I apologized for the fact that, you know, the children wouldn't take the presents and I expressed my sympathy and asked her what she wanted me to do with the presents. And finally I believe I mailed the cards back to her. The freight on the other stuff was so much I did not mail that. I don't remember what we decided to do with it."
E.M.N. had asked R.V. to also send cards to the children since cards coming from her were being refused. On January 22, 1972, R.V. returned those cards deciding that before he sent the cards he should ask H.J.N. for permission to do so. H.J.N. asked R.V. not to send them. By way of *714 apology for this situation, R.V., in his letter, stated:
". . . to make a long story short, he asked me not to send the cards. Maybe you cannot understand my actions. However, all I can say is that if I were your attorney I would give your wishes and desires the same consideration. . ."
On February 9, 1972, E.M.N. sent a package to her son D.G.N. which was returned, unopened and marked refused. Prior to February 17 E.M.N. phoned from Alaska and spoke with her daughter E.C. N. but received a very cool reception. H.J.N. came to the phone and told her that the children refused to talk to her. As described by E.M.N.: "And by this time her father had picked up the extension and said, `Just let them alone, they don't want to talk to you.' And so consequently we broke the connection."
On February 28 E.M.N. sent a birthday card to her son M.W.N. It was returned, unopened and marked refused. Enclosed in the card was a letter in which she expressed her continuing love for her son. It was in that letter she noted that the birthday present to D.G.N. had been returned and she asked M.W.N. for his permission to send him a present and his permission to correspond with him. She asked that he tell her what he wanted and she would get it for him, expressing also her great sadness on the return of her letters and packages.
E.M.N. thereafter advised her attorney that H.J.N. refused to allow the children to have Christmas presents she had sent them. By letter of March 8, 1972, her attorney advised R.V., attorney of H.J.N., of E.M.N.'s feelings and asked that R.V. advise him of H.J.N.'s plans "to allow the children to have the presents, etc." By this letter he also advised that E.M.N. would not sign the car title sent to her by H.J.N. until such time as the children were permitted to receive their presents and she was advised of that fact.
In the spring of 1972 H.J.N. and M.A.N. were married. On April 22 M.A.N. phoned E.M.N. in Alaska and though the record does not disclose their conversation, by her testimony, M.A.N. made clear her feelings concerning E.M.N. and her attempts to stay in touch with the children. "But the seven children have always had thistheir mother is still living and this has always been a constant turmoil. You know, with the cards coming in."
In spite of the return of the cards, letters and presents, E.M.N. corresponded with the children at least once a month on the average, and after December, 1971, received no response for her efforts. As she testified, ". . . But I have corresponded with them everyI would say at least once a month on the average. With no return to my efforts."
In the late spring or summer of 1972 E.M.N. contacted a friend, B.W., and asked her to mail a birthday card to one of the girls. The purpose was to show a different mailing address and avoid control of the children's mail by H.J.N. Following this attempt, H.J.N. called B.W. late one evening and inquired if she had mailed the letter. On learning that she had, he stated, "[as B.W. testified] . . . they didn't want the kids toto hear from [E.M.N.]. They did not want me to do that again. He gave me the understanding if I did he would get him a lawyer. If I mailed another card to the kids he would get a lawyer." (Emphasis ours.) In her correspondence to the children E.M.N. said that they were welcome to come to her at any time but if they wanted to stay with their father, she would not interfere. (Petitioners' exhibits #8 and #9.)
During the Christmas season of 1972 E.M.N. sent Christmas cards and told the children she would like to send them something for Christmas and implored them to write back and tell her what she could send. As she put it, "`. . . write me back and tell me what I can send you for Christmas, as I don't know what you need. And will you accept it when I send it.' I *715 didn't get a return." At the trial she testified she would like to have the children with her part of the time if possible. During the statutory year preceding December 9, 1972, E.M.N.'s parents had requested on her behalf the privilege of visitation with the children.
The court below has found that consent of appellant, the natural mother of the minor children, is not required because appellant "willfully abandoned" the children for a period of more than one year prior to the filing of the adoption petition.
The words "willfully abandoned" have been consistently interpreted since In re Watson's Adoption, 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946), to mean:
". . . first, a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial effection." (Emphasis ours.)
Moreover, "The abandonment must be absolute, complete, and wilful. There must be a settled purpose to forego all parental duties and relinquish all parental claims." In re Adoption of J., 396 S.W.2d 257, 261 (Mo.App.1965). See also, In re Adoption of Rule, supra, 435 S.W.2d at 40.
The conduct of a parent constituting willfull abandonment must have occurred during the year preceding the filing of the adoption petition; however, "because abandonment is a matter of intent, evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent, . . ." In re Adoption of K., 417 S.W.2d 702, 709 (Mo.App.1967). See, In re Adoption of J., supra, 396 S.W.2d at 261-262. Respondent filed no brief on this appeal defending the decree for adoption.
In the seven months preceding the statutory year, from the time appellant first left her children, she expressed an intention to remain their parent, to love them, to have them visit her when they wished, to have their pictures to "show them off" and to send them clothing and presents. The award of custody by the divorce decree does not terminate parental rights and the mother previously told the children they could remain with their father if they chose. Thoughout the statutory year, while she was in Alaska and after the divorce, she sent them birthday cards and letters, attempted to have Christmas presents delivered to them, asked her former husband's attorney to intercede to deliver mail and gifts to them and caused her own attorney to write and demand the right to communicate with the children. Respondents testified that E.M.N. had not visited the children since the fall of 1971 but we believe that E.M.N. concluded the not inexpensive trip from Alaska would be useless and could only increase hostility which time might soften.
Respondents alleged they had no knowledge of appellant's whereabouts. The evidence, including their own exhibits and testimony, suggests they did. They had acquired the knowledge, or the means of easily obtaining it, because appellant doggedly attempted to maintain contact with her children, through an ingenious variety of means, including the Missouri friend who sent the son's birthday card with a local postmark to escape disapproving censorship, and was reproached by H.J.N. for her efforts. He told B.W. that "they" didn't want the children to hear from their mother.
If the adoption statute is to be strictly construed in favor of parental rights, and every reasonable intendment made in favor of a natural parent's claims, it is difficult to see how a willfull abandonment, absolute and complete, could be made from the facts of this case. We find there was no willfull abandonment during the statutory year. Moreover, there was no substantial *716 evidence offered that appellant was not fit to remain the parent of these children. Indeed, she has remarried and with her husband operates a successful business in Alaska. Her husband has retired from the military and they have post privileges and free medical services. They live in an apartment but have a house available for them when required. Their business is quite profitable and they would be able to support and take care of the children. Her health, and that of her husband, is good and her present husband would have no objection to the children visiting in their new home. E.M.N. would like to visit the children in the home where they presently live if she were allowed.
Finally, since the adoption statute requires the court to give paramount consideration to the welfare of the children, it may not be improper to ask what benefit these children would obtain by the decrees of adoption. Here the father and the stepmother have actual custody until the court finds reason for change. These children are not infants who might best never know their natural parent; for them adoption will change a legal relationship but will not erase memory and feeling; it will not even change their names. Adoption would deprive the mother of the right to visit the children during their minority and deprive the children of any inheritance from her. In re Adoption of J., supra, at 263. We think the evidence in this case shows that the primary purpose of this proceeding was to have the legal status changed so that the mother could no longer visit or contend for visiting rights and to deny her the right of communication with her children.
How often have trial courts admonished divorcing parents to refrain from visiting their differences upon the children of the then broken home? From this record we deem such admonition richly deserves reiteration to these divorced parents. The out-of-custody mother is entitled to assurances that her letters, presents and reasonable attempts to communicate with her children will reach the children uncensored, sans bitter or disparaging comments of the father or others at the home.
The decrees of the trial court are reversed.
DOWD, C. J., and WEIER and CLEMENS, JJ., concur.
NOTES
[1] All statute references hereinafter are to RSMo 1969, V.A.M.S., unless otherwise noted.