**In the Matter of T.C.M. and B.J.M., Petitioners-Respondents,**

**and**

**J.M.M., Respondent-Appellant.**

**No. 43191.**

Missouri Court of Appeals, Eastern District.

March 15, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 13, 1983.

Application to Transfer Denied June 30, 1983.

Murphy & Associates, P.C. by Edward E. Murphy, Jr., Clayton, for respondent-appellant.

Lashly, Caruthers, Thies, Rava & Hamel, P.C. by Rexford H. Caruthers, William E. Buckley and Amy Rehm Hinderer, St. Louis, for petitioners-respondents.

SATZ, Judge.

This cause arises from the trial court's decree of adoption for two children which terminated the parental rights of the children's divorced natural mother. The petition for adoption was filed by the natural father and his present wife on July 18, 1978. The petitioners alleged that the natural mother had willfully abandoned the minor

children for a period of at least one year immediately prior to the filing of the petition. The natural mother now appeals the trial court's decree of adoption. This Court, in Division, reversed the decree of adoption, with a dissent. A motion for rehearing was granted. With additional briefs and oral argument, the cause was submitted to the Court en banc. We again reverse.

Appellant M, the natural mother, and Respondent C, the natural father, were married in California in September of 1966.[1] Two children were born of this marriage, A.M., a girl, born October 27, 1969 and M.M., a boy, born January 16, 1972. In June of 1972, the family moved to Durham, North Carolina where C found employment. C and M separated in July of 1973 while they still resided in Durham, North Carolina. At the time of separation A.M., the oldest child, was four years old and M.M. was one and one-half years old. By order of the court in North Carolina, M was awarded custody of the children in October, 1973. In January of 1974, M voluntarily committed herself to a local hospital for psychiatric care and, in February, 1974, during a temporary release from the hospital, she tried to kill herself by taking an overdose of medicine. She was rehospitalized until April, 1974 and remained under the care and treatment of a psychiatrist for 2 more years until June 1976. Because of M's sickness, the award of the children's custody to her was changed by court order, and, in February of 1974, C was awarded custody of the two children. The award of custody to C was made permanent in a divorce decree entered by the North Carolina Court on February 21, 1975. M retained reasonable rights of visitation. Soon after his divorce from M, C married his present wife J. In June of 1975, C and J, along with the two children, moved from Durham, North Carolina to Lynchburg, Virginia. In July, 1976, C moved the family to Missouri, and they have resided in St. Louis County ever since. M, the natural mother of the children, continues to reside in North Carolina.

In July, 1978, C and J filed a petition to adopt the children A.M. and M.M. in St. Louis County. M refused to consent to the adoption. In its findings of fact, the trial court specifically found that M had made no request to see either of the children and had made no attempt to talk to either of them through 1976 and 1977, until May 1978, when the adoption proceedings were first discussed. The court concluded that M, at best, had token contact with her children in the two years prior to the filing of the adoption petition and had, therefore, willfully abandoned the children. Under the adoption statute, § 453.040 RSMo 1978,[2] the finding of willful abandonment by a parent eliminates the necessity of obtaining the parent's consent to the adoption. Thus, the trial court approved the adoption of the two children after finding it was in their best interests to do so. § 453.030.1.[3]

Appellant first argues that the trial court lacked jurisdiction over the subject matter in this case. She contends that the Uniform Child Custody Jurisdiction Act (UCCJA), § 452.440 et seq., prohibited the trial court from taking jurisdiction of the adoption proceeding because the adoption decree affects the prior custody decree made in North Carolina. We disagree.

Prior to the adoption of the UCCJA in 1978, an extant custody decree from another state would not affect a Missouri court's jurisdiction in an adoption proceeding. *In re Adoption of Rule,* 435 S.W.2d 35, 39–40 (Mo.App.1968); *In re Adoption of P.J.K.,* 359 S.W.2d 360, 362 (Mo.App.1962). Apparently, it is a matter of first impression whether the UCCJA changes this jurisdictional rule. The UCCJA is designed to "assure the litigation concerning the custody of a child take[s] place ordinarily in the state with which the child and his family have the closest connection . . ., and that

1. The trial court made Findings of Fact and Conclusions of Law along with its decree of adoption.

2. All statutory references are to RSMo 1978.

3. The remainder of the facts will be set down as necessary for the development of this opinion.

courts of [one] state decline the exercise of jurisdiction when the child and his family have a closer connection with another state." 9 Uniform Laws Annotated, Master Ed., § 1(a)(3), p. 117. Thus, the UCCJA limits our courts to acting in those custody proceedings defined in § 452.445, under circumstances set out in § 452.450. Appellant sets out the various statutory definitions of "custody determination," "custody proceedings," "custody decree," and "modification decree" and, although adoptions are not explicitly included in these definitions, appellant argues adoptions must be included because an adoption decree terminates "any prior custody rights in a living parent." Then, appellant reasons, since adoptions are contemplated by the UCCJA, the trial court lacked jurisdiction to proceed with the adoption and could do nothing more, under the UCCJA, but "recognize and enforce" § 452.500 the North Carolina decree awarding visitation rights to M.

Appellant does not demonstrate which of the defined categories implicitly includes adoptions. However, even if adoption proceedings do come within the UCCJA, the trial court did have jurisdiction here to modify the North Carolina custody decree. § 452.505 provides that:

> "If a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with sections 452.440 to 452.550 or has declined to assume jurisdiction to modify the decree and the court of this state has jurisdiction."

Thus, whether a Missouri court has jurisdiction to modify a court decree of another state under the UCCJA, turns first on whether the latter court has lost or declined its jurisdiction, and second on whether Missouri has jurisdiction under the Act. *See Slidell v. Valentine,* 298 N.W.2d 599, 602 (Iowa 1980); *Pierce v. Pierce,* 287 N.W.2d 879, 882 (Iowa 1980).

The second question is easily answered here. Because the children here had lived with a parent in this state for at least six consecutive months, Missouri was the "home state" of the children, § 452.445(4). As the home state, Missouri could assume jurisdiction to make a child custody determination, § 452.450.1(1)(a), unless North Carolina still retained jurisdiction. § 452.-505. There is no evidence that North Carolina has at any time declined to assume jurisdiction to modify its decree. Thus, the ultimate question is whether North Carolina retained or, in the statutory language, would "now have jurisdiction under the jurisdictional prerequisites ... [of] § 452.440 to 452.550." § 452.505.

There are four possible bases of North Carolina's jurisdiction under the UCCJA. § 452.450.1(1), (4):

"(1) This state:

(a) Is the home state of the child at the time of commencement of the proceeding; or

(b) Had been the child's home state within six months before commencement of the proceeding and the child is. absent from this state for any reason, and a parent or person acting as parent continues to live in this state; or

(2) It is in the best interest of the child that a court of this state assume jurisdiction because:

(a) The child and his parents, or the child and at least one litigant, have a significant connection with this state; and

(b) There is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(3) The child is physically present in this state and:

(a) The child has been abandoned; or

(b) It is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse, or is otherwise being neglected; or

(4) It appears that no other state would have jurisdiction under prerequi-

sites substantially in accordance with subdivision (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction."

North Carolina would not have jurisdiction as the home state since at the time the adoption petition was filed, the children had been absent from North Carolina for over two years. *See* § 452.445(4); *Slidell v. Valentine, supra* at 602–604. We also find North Carolina would not have jurisdiction under the "best interest" arm of § 452.450.-1(2). At the time the adoption petition was filed, the children had not lived in North Carolina for over two years and were not likely to return there. While the natural mother still lived in North Carolina, the statute requires *both* the child and the parent to have a significant connection with the state, and there must be available in that state "substantial evidence concerning the child's present or future care, protection [and] training." § 452.450.1(2)(a) and (b). Here the nexus between the children and the state of North Carolina falls short of the "significant connection" required to assume jurisdiction under this alternative. *See Slidell v. Valentine, supra,* at 604. The other two alternatives based on emergency § 452.450.1(3) or non-availability of another forum § 452.450.1(4) are clearly not applicable, since the children were not present in North Carolina § 452.450.1(3) and Missouri, as the home state, is a proper forum § 452.450.1(4). Thus, all the elements of § 452.505 were satisfied and, under the UCCJA, the trial court had jurisdiction to modify the existing North Carolina custody decree at the time this adoption petiton was filed. M's argument disputing the trial court's jurisdiction must fail.

M's second point on appeal alleges that the trial court erred in finding that M had "willfully abandoned"[4] her children. M concedes that she did not see either of her children during the 2½ years prior to the filing of the petition for adoption. She also concedes that she made no request to see either of them during that period nor did she attempt to talk to them by telephone or correspond by mail, "except for the birthday card to M.M." and the Christmas cards she claims she mailed to the children. She argues, however, her intent inferred from these facts was not a settled intent to willfully abandon her children but rather her intent was to avoid trauma-causing contact with the children.

[2–4] Willful abandonment is defined as "... first, a voluntary and intentional relinquishment of the custody of the child to another, with the intent to *never again* claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial affection." (Emphasis theirs). *In re Watson's Adoption,* 238 Mo. App. 1104, 195 S.W.2d 331, 336 (Mo.App. 1946); *In re E.C.N.,* 517 S.W.2d 709, 715 (Mo.App.1974). "The conduct of the parent which amounts to abandonment must have occurred for the year immediately preceding the filing of the adoption proceeding. (Case omitted). There must be a settled purpose to forego all parental duties and relinquish all parental claims throughout the statutory period." *Matter of K.M.B.,* 544 S.W.2d 590, 592 (Mo.App.1976). Thus, abandonment focuses on the intent of the parent, and intent, an inferred fact, is determined by considering all of the evidence of the parent's conduct. *See Matter of Adoption of Fuller,* 544 S.W.2d 345, 349–350 (Mo.App.1976); *Young v. Young,* 588 S.W.2d 207, 209 (Mo.App.1979).

---

4. The petition for adoption is based upon M's willful abandonment not willful abandonment and/or willful neglect. The trial court, however, concluded that M "willfully abandoned and neglected said children." We do not find that the parties tried the issue of neglect by implication *see Domijan v. Harp,* 340 S.W.2d 728, 733 (Mo.1960) and the parties' briefs are devoted to the issue of abandonment not neglect. Therefore, we consider the issue of abandonment only.

Our adoption statutes do not define the burden of proof which must be met to prove the intent to willfully abandon the child. § 453.010 et seq. Without discussion, our intermediate appellate courts have referred to this burden both as the "preponderance of the evidence," *In re E.C.N., supra* at 711;[5] *In re C., C. & C,* 380 S.W.2d 510, 515 (Mo.App.1964)[6] and as proof by "clear, cogent and convincing evidence." *Matter of Adoption of Richards,* 624 S.W.2d 483, 486 (Mo.App.1981); *Matter of Adoption of Baby Boy Doe,* 600 S.W.2d 658, 659 (Mo. App.1980). Our research has uncovered no definitive guide as to which standard should be applied in Missouri. The choice between the two standards, however, must be carefully made for it is crucial to the outcome of this case. It is our opinion that the findings of the trial court are not supported by clear, cogent and convincing evidence.

The recent decision of *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) contains a discussion which, though not directly on point, is helpful to our analysis of the proper burden of proof. In that case, the Court rejected the preponderance standard as violative of due process and held that, in state-initiated permanent neglect proceedings, a state can terminate parental rights only upon a showing of clear, cogent and convincing evidence.

The Court noted that under a preponderance standard the risk of error in the fact finding process is equally shared by the litigants. A heightened standard of proof is warranted where society makes a judgment that one litigant has more at stake so that the risk of error is rightly borne by his adversary. *Santosky v. Kramer, supra* at 1395. Admittedly, the interests involved in a step-parent adoption differ from those involved in the termination of parental rights by the state. But they both have in common the termination of parental rights and the reasoning in *Santosky* determining the correct standard of proof is, therefore, relevant.

In a step-parent adoption, an erroneous termination of parental rights has a more substantial effect on the parent than an erroneous failure to terminate parental rights has on the child. For the child, the error in failing to terminate parental rights means a continuation of the status quo. His life with his step-parent will continue as usual with only periodic interruptions caused by his natural parent's exercise of visitation rights. For the parent, however, an erroneous termination ends forever his relationship with his child. "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky v. Kramer, supra* at 1394. The interests at stake here are not of "roughly equal societal importance." *Id.* at 1411 (Rehnquist, J., dissenting). The natural parent clearly has more at stake. Thus, the risk of erroneously terminating parental rights should be minimized by applying a heightened standard of proof.

This conclusion is further supported by decisions of our courts. In adoption cases involving termination of parental rights without parental consent, our courts repeatedly refer to parental rights as the "highest of natural rights," *e.g., In re Adoption of J.,* 396 S.W.2d 257, 261 (Mo. App.1965) and repeatedly state that adoption statutes must be strictly construed in favor of parental rights. *E.g., In re Perkins,* 234 Mo.App. 716, 117 S.W.2d 686, 691 (Mo.App.1938); *Adoption of R.A.B. v.*

---

5. In reviewing the decree granting adoption without consent of the natural mother, it was the duty of the court of appeals "to review the record, as in actions of equitable nature, upon the law and evidence and reach [its] own conclusions, giving due deference to the trial court on questions of credibility. Unless the judgment was clearly erroneous and in conflict with the clear preponderance of the evidence, it should not be lightly disturbed." *Id.* at 711. "The use of the words ... clearly erroneous is no longer appropriate in appellate review of cases under rule 73.01." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

6. "... [T]he trial court's judgment in ... [an adoption case based upon willful neglect] is not to be set aside unless clearly erroneous and in conflict with the clear preponderance of evidence disclosing a manifest abuse of discretion." *Id.* at 515–516.

*R.A.B.,* 562 S.W.2d 356, 360 (Mo. banc 1978). This language translates sensibly into minimizing the risk of error by terminating parental rights only by "clear, cogent and convincing evidence." Moreover, this heightened standard of proof is explicitly adopted by our legislature which requires clear, cogent and convincing evidence before the state can terminate parental rights under § 211.447.[7]

We, therefore, hold that the trial court's decree of adoption is proper only if its finding that M abandoned her children is supported by clear, cogent and convincing evidence.[8]

■ From the time of the legal separation of C, the natural father, and M, the natural mother, in July, 1973 until February, 1976, M exhibited a continuous desire to maintain a close relationship with her children. It was M who initially obtained custody of the children and custody was

7. "Because proof by preponderance of the evidence requires that '[t]he litigants ... share the risk of error in a roughly equal fashion' ..., it rationally should be applied only when the interests at stake are of roughly equal societal importance." *Santosky v. Kramer, supra* at 1411 (Rehnquist, J., dissenting). The clear, cogent and convincing standard of our termination statute, § 211.447, under which the state proceeds to terminate parental rights, reflects our state's determination that the undesirable consequences of an erroneous finding of abandonment—the unwarranted termination of parental rights—is more unacceptable than the erroneous failure to find abandonment—the risk of permanent injury to the child either by return of the child to an uncaring parent or by the child's return to a non-permanent foster home. From this it follows that the clear, cogent and convincing standard should be applied in a step-parent adoption because, in a step-parent adoption, the risk of permanent injury to the child resulting from an erroneous failure to find abandonment is even less than in the termination proceeding under § 211.447."

8. The dissent states that parental rights are not absolute and are not the only factor to be considered in an adoption proceeding. We agree. This dissent, however, implies that parental rights and the bundle of rights labeled "the best interests of the child" are considered at the same time and weighted against one another in determining whether neglect or abandonment has been established. We disagree.

transferred to C only because of M's sickness and at a time when M was in the hospital. Until she was discharged from the hospital in April, 1974, M was visited in the hospital by the children on a regular basis. Then, from April, 1974, until June of 1975, M visited the children in Durham approximately every other week. These regular visits continued up to the time C, his new wife and the children moved to Lynchburg, Virginia. M learned of the move only after she discovered the family home had been put up for sale. She confronted C with this information and he told her of the proposed move. M "expressed concern what might happen when [they] moved from Durham to Lynchburg, Virginia." This expressed concern prompted C to write to M on April 2, 1975:

"M ————,

Your visitation rights, of course, will not change after we move. I trust that

Conceptually, a step-parent adoption based upon neglect or abandonment is a two-stage process. The court must first determine whether the non-adopting parent has neglected or abandoned the child for the statutory period; and, if the court so finds, it then must decide whether the adoption would be in the best interest of the child. Neglect or abandonment, like consent, is a prerequisite to the court's power to act. *E.g., Matter of K.B.,* 544 S.W.2d 590, 592 (Mo.App.1976). If the court cannot find neglect or abandonment, it has no power to grant the adoption. *Id.* at 593; *In re Adoption of K,* 417 S.W.2d 702, 709 (Mo.App. 1967). If neglect or abandonment is found, the court may then focus its attention on whether the adoption would be in the best interest of the child. *In re Adoption of K, supra* at 709. It is in this context that 453.030.1 RSMo 1978, referred to in the dissent, provides that the approval of an adoption "shall be given or withheld as the welfare of the person sought to be adopted may, in the opinion of the court, demand."

In a step-parent adoption, the relative values society places on parental rights and "the best interest of the child" are relevant, however, in determining the quantum or burden of proof required to terminate parental rights. We have concluded these relative values, as reflected in our statutes and our case law, require clear, cogent and convincing evidence to terminate parental rights in a step-parent adoption.

was your concern. The children are well and happy.

C_____"

After C's marriage to J and the move to Lynchburg, M's continued visitation with the children became more difficult because Lynchburg was approximately 100 miles from M's residence in Durham and also because from that time C began to discourage M's visits. In August of 1975 when the children were 5½ and 3½ years old, C wrote the following letter to M:

Dear M_____,

The children were spontaneously discussing some things today. They stated that they wish not to have you visit them and want only to be here with us. These were not prompted sentiments, and were seriously and genuinely meant. I hope you will consider the welfare of A_____ and M_____ and not confuse them. Your regard for their best interests would be best expressed by leaving them alone. I sincerely hope you will consider this and decide not to come to Lynchburg.

C_____"

In her response to this letter, M agreed to cancel a previously arranged visit but ended her letter saying, "I love the children and miss them very much."

Nonetheless, M visited the children in Lynchburg three times in late 1975 and once in January of 1976. It was apparent that these visits were emotionally traumatic for the children. The oldest child, A.M., refused to meet with M on the last two visits and the last visit with the younger child in January, 1976, was aborted after only 2 hours. M was on the horns of a dilemma. She was caught in a Solomonic kind of situation. Like the Biblical mother who chose to give up her child rather than see it cut in two,[9] M had to choose between her maternal desire to see the children and her equally strong maternal desire to protect them from emotional trauma. Her response to this dilemma was two letters she wrote to C in February, 1976. The contents of the letters, in effect, acknowledged C's suggestion that the children's "best interest would be best expressed by [M] leaving them alone." In one letter, M stated she would no longer be asking to see the children since it was apparent that her visits were a burden on the children. In the other, written two days later, she expressed doubt whether she should even attempt to communicate with them "at all now or for some indeterminate time to come." In the letter, M also stated:

"You can best judge this and if you feel it would be best for either one of them, or both, that I not get in touch with them, even including cards and gifts, please let me know."

C responded with a short note of his own which stated:

"We concur in your decision about not seeing [the children] and not communicating with them."

In the context in which they were written, M's letters do not necessarily convey an intent to abandon the children. As noted, abandonment is the voluntary relinquishment of the custody of the child to another with the settled purpose to *never again* claim the rights of a parent or in the alternative, an intentional withholding from the child by the parent of his presence, his care and his love without just cause or excuse. *See, e.g., In re Watson's Adoption, supra* at 336. While one may infer from these letters that M wanted to permanently terminate her relations with the children or that she intentionally withheld her presence from them without just cause or excuse, it is at least equally reasonable to infer that M intended to stop seeing and communicating with them only temporarily, on the advice of C, so as to protect them from the trauma of the visits. The issue, then, turns on whether M's conduct subsequent to the letters "clearly and convincingly" supports an intention to abandon the children.

From February, 1976, until the time the petition for adoption was filed in July, 1978, M did not visit with the children. Likewise,

9. 1 Kings 3:16–28.

M's communication with the children during that time was limited to a birthday card to M.M. in 1977.[10] However, since 1974, M has been afforded vacation time from her employment amounting to 22 working days each year. In 1977, she took a trip to California and Kansas City, and as found by the court and conceded by M, she was financially, physically and mentally able to contact and visit the children in the year preceding the filing of the petition for adoption but she made no effort to do so.

Arguably, this conduct is as consistent with her avoiding her children in what she believed was their best interest as it is with an intent to abandon them. However, when asked whether she thought "it was in the best interest of the children ... to totally refrain from seeing them in 1976, 1977 and the first four months of 1978," she answered, "No, I did not think it was in their best interest. There was no other way because I had to get well enough to come back into the situation and face the realities that were there and deal with them;" the realities, according to her, being "the bitter opposition of [C and J] to [her] seeing [the] children on any regular basis." Moreover, she did not initiate any legal action to overcome these asserted difficulties to her exercise of her visitation rights because she stated she was not strong enough. In addition, she stated she was not strong enough to write letters to her children.

During this period, M made no attempt to inquire about the children's health or well-being. The one letter she wrote to C during this time concerned a late alimony check, and the letter made no mention of the children. Yet, during this time, from 1974 to 1978, M had returned to work as a full-time librarian, supervising three full-time and two part-time employees. It was not until June, 1978, after C had sent M consent forms for adoption, that M wrote to

C suggesting a visit with the children that summer and stating that his "letter arrived just when I had been thinking about writing to let you know of my interest in seeing the children."

After the adoption petition was filed, M obtained an order from the St. Louis County Circuit Court enforcing her visitation rights under the custody provision of the North Carolina divorce decree. This week long court enforced visitation in December of 1978, was tumultuous and unpleasant for all of the parties involved. On two occasions the children ran away from M and were picked up by their stepmother and returned home. When M went back home to try to get the children to continue the visit, there was quite a conflict and the police were called. According to the Court's Domestic Relation Supervisor ordered by the Court to monitor the visitation, "M absolutely made no headway in establishing a relationship with her children." "[T]he children were ... unwilling to go with [M] and ... cried and fussed." Nevertheless, M persisted in attempting to reestablish her relationship with the children by filing a Motion to Modify her visitation rights, requesting specific rights of visitation over the summer and at Christmas in 1979. This strenuous renewed activity concerning the children is, at least, an indication that M did not intend to abandon them during her two and one-half years absence, see *R.A.B. v. R.A.B., supra* at 358, or in the alternative an indication of repentence from abandonment. See *In re Adoption of J, supra* at 262; *T.H. v. Ambelang,* 497 S.W.2d 210, 212 (Mo.App.1973).

To the trial court, the issue to be resolved from these facts was whether there was "pressure exerted in subtle ways [by M's] ... condition which chased her from the children or was it finally under the circumstances, she didn't care and she really dropped them"[11] and the trial court should

---

10. M testified she also sent additional birthday cards and Christmas cards to the children in 1977 and 1978. The trial court found only the birthday card in January, 1977 was sent.

11. "In determining this appeal we must remember that as the trier of fact, the trial court had leave to believe or disbelieve all, part or none of the testimony of any witness. *Willard v. Doyle,* 612 S.W.2d 884, 888 (Mo.App.1981) cit-

terminate M's parental rights. From the finding of willful abandonment, it is obvious that the court did not credit M's testimony [12] that she was not "strong" enough to communicate with the children, enforce her visitation rights or inquire about their health and well being while at the same time she was strong enough to work.

But even allowing the trial court its discretion to rule on the credibility of witnesses, it is at best a questionable inference from these facts that "finally under the circumstances, [M] didn't care and she really dropped" her children.[13] While it is true that M did not attempt to see or communicate with the children or even to inquire as to their well being for 2½ years, her initial decision not to see the children was made at C's suggestion. Moreover, she demonstrated great love and concern for the children both before and after this period. In determining a parent's intent to abandon, evidence of their conduct both before and after the statutory period can be considered. *R.A.B. v. R.A.B., supra* at 358. Prior to the 2½ year period, M consistently displayed her love for the children and visited with them regularly. Subsequent to the filing of the adoption petition, at the end of the 2½ year period, M persisted in her efforts to reestablish the relationship with them in the face of great difficulties. At best, only a weak inference can be made that M loved her children in February, 1976, developed an intent to abandon them between March of 1976 and June, 1977, maintained that intent throughout the statutory year and then reacquired her love and caring subsequent to the statutory period. Although each case determining the existence of an

intent to willfully abandon children necessarily depends on the operative facts of that case, the facts of those cases in which the courts have found willful abandonment contrast sharply with the present case. In those cases finding willful abandonment, the "abandoning" parent either showed a clear lack of interest in the child *R.F.N. v. G.R.,* 546 S.W.2d 510, 512 (Mo.App.1976) (natural mother offered to consent to adoption in exchange for $5,000); *In re McAvoy's Adoption,* 237 Mo.App. 1099, 173 S.W.2d 108, 110 (Mo.App.1943) (natural mother who was unwed at birth of child refused to assume custody at time of her subsequent marriage though her new husband was willing to have the child), or expressed an intent at some earlier date to put the child up for adoption *T.H. v. Ambelang, supra* at 211; *In re McAvoy's Adoption, supra* at 109–110 or expressed an intent to refrain from ever taking any responsibility for raising him. *In re Adoption of S,* 581 S.W.2d 113, 116–117 (Mo.App. 1979).

Aside from the passing of time in evidence here, *compare, In re McAvoy's Adoption, supra,* during which M did not see or speak to the children, M's failure to inquire about the children for a 2½ year period is the only operative fact which permits more than an equivocal inference about M's intent subsequent to the February letters. For example, there was no overt act, *see S.K.L. v. Smith,* 480 S.W.2d 119, 124 (Mo.App.1972) (termination by the state) nor any definitive statement, *see T.H. v. Ambelang, supra* at 212 (termination by the state) effectively showing that M no longer cared for the children or that

---

ing *Cave v. Cave,* 593 S.W.2d 592, 595 (Mo. App.1979)."

12. In the trial court's place, we might have chosen to credit M's testimony in the belief that she was strong enough to work and supervise employees while still not being strong enough to confront the personal problems created by visitation with the children.

13. A finding that the latter was true would satisfy either definition of abandonment noted above. It would indicate that at a time when M had relinquished custody of the children to C she developed an intent to never again claim

the rights of a parent (i.e., she really dropped them) or in the alternative, it would indicate that during this period, she intentionally withheld her love and presence from the children not because of any "just cause or excuse" but because "finally under the circumstances she didn't care." Our conclusion that the trial court did not resolve this issue of fact with the support of clear, cogent and convincing evidence, thus, relates to both definitions of willful abandonment found in *In re Watson's Adoption, supra* at 336.

she considered her relationship with them ended.

■ The clear, cogent and convincing standard is met when the court is "... *clearly convinced* of the affirmative of the proposition to be proved. This does not mean that there may not be contrary evidence." (Emphasis theirs). *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo.1974). " 'For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.' " *Matter of O'Brien*, 600 S.W.2d 695, 697 (Mo.App.1980).

Our review of the record has failed to uncover evidence which instantly tilts the scales and leaves an abiding conviction that M willfully abandoned her children. The trial court's finding of willful abandonment is not supported by clear, cogent and convincing evidence.

Judgment reversed.

STEWART, C.J., and DOWD and SMITH, JJ., concur.

PUDLOWSKI, J., concurs in part and dissents in part in separate dissenting opinion.

SNYDER and CRANDALL, JJ., dissent and concur in separate dissenting opinion of PUDLOWSKI, J.

PUDLOWSKI, Judge, dissenting.

I concur with the majority that the trial court had jurisdiction over the subject matter but I respectfully dissent from the second point of the majority's opinion for I feel that the record reflects sufficient evidence for the trial court to find clearly and convincingly that "M" wilfully abandoned the children. I would affirm the trial court's decision.

This court opined by Judge Gunn in the *Matter of Adoption of Shelly* ____, 625 S.W.2d 183, 184 (Mo.App.1981) that, "Our review of these court-tried proceedings is bound by the fundamental precepts that we are to affirm the judgment unless there is no substantial evidence to support it or it is against the weight of the evidence or it erroneously declares the law or applies it. Conflicts in evidence are for resolution by the trial court, which may believe all, part or none of the testimony of any witness, and our statement of facts will treat the evidence in the light most favorable to the judgment of the trial court. *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 483 (Mo. banc 1980). With these principles serving as guideposts, the facts clearly support the trial court's judgment."

The *standard of review* on appeal is not identical to the *burden of proof* which must be met in the trial court. At trial, the "clear, cogent and convincing" evidence standard requires that as a trier of fact, the "*court* should be clearly convinced of the affirmative of the proposition to be proved." *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo.1974). (emphasis added). The "fact finder's mind" must be "left with an abiding conviction that the evidence is true." *Matter of O'Brien*, 600 S.W.2d 695, 697 (Mo.App.1980). On appellate review under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), we do not consider the evidence de novo. In an equitable review of what is clear and convincing all that is required is that substantial evidence exist whereby this court can say that the trial judge acted as a reasonable man in finding that the proof of the fact asserted is greater than a mere preponderance of the evidence. *Naisbitt v. Hodges*, 307 P.2d 620, 624, 6 Utah 2d 116 (1957). I believe that the experienced juvenile judge could reasonably have been convinced that M.M. had wilfully abandoned her children. In a case where credibility and intent are such critical factors, this court should be especially reluctant to reverse based on a reading of the cold record, without any opportunity to observe the demeanor of the witnesses. The trial judge specifically found that M.M. "had but token contact with her two minor children in the two years prior to the filing of the Petition for Adoption even though she had the financial, physical and mental ability to maintain a viable relationship

with said children . . . ." The majority concedes that the trial judge could have reasonably inferred from M's letters "that M wanted to permanently terminate her relations with the children" and that her conduct during the statutory period was arguably consistent with an intent to abandon them. I concur with the trial court's conclusion and further believe that we should not substitute our own judgment for that of the trial court.

In finding that M.M. did not intend to abandon her children during the statutory period, the majority puts great weight on her strenuous *legal* efforts to prevent this adoption and regain some rights of temporary custody. These legal efforts, initiated only *after* M.M. had received notice of the adoption proceedings, do not necessarily indicate that M.M. intended to maintain a parental relationship with her children.

> "More to the point . . . is the matter of communication—communication of love and affection by a parent to a child; the parent's expression of interest in the child and his world; the communicated desire to be in the child's company whenever possible; the development of a commonality of interest and an empathy with him. These are the things that count heavily in a situation where by force of circumstances personal visitation is impossible."

*Lambertus v. Santino,* 608 S.W.2d 502, 506 (Mo.App.1980). Indications of this sort of interest and empathy are strikingly absent from the record before us. Tragic as it may be, the trial judge was clearly convinced that the heart of the parental relationship was missing here. The parental duties of care and formation are inseparable from parental claims to custody and control. *In re Adoption of S,* 581 S.W.2d 113, 116 (Mo. App.1979). Parents do not have a property right in their children. *Matter of Adoption of R.P.R.,* 291 N.W.2d 591, 596, 95 Wis.2d 573 (App.1980), rev'd on other grounds, 297 N.W.2d 833, 98 Wis.2d 613 (1980). "A parent should not be able to treat a child as a

plaything to pick up for sporadic enjoyment at his whim, while at the same time disclaiming the burdens, sacrifices, and oft times pains of nurturing and caring for the child." *In re Adoption of S,* 581 S.W.2d at 116. Based upon the record before us, the trial judge could reasonably have concluded that M.M. was in fact capable of maintaining a relationship with her children, but failed to do so without just cause or excuse.

The majority opinion properly recognizes the "fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] . . . ." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982). These parental rights, however, are not absolute, and are not the only factor to be considered in an adoption proceeding. "The general rule that natural parents have a primary right to the custody of their children is controlling when it is consistent with the welfare of those children . . . . When in conflict, however, the rule favoring parental custody is superceded by the concerns of the state for the child's welfare." *In the Interest of C.L.M.,* 625 S.W.2d 613, 617 (Mo. banc 1981). See generally Note, "Developments in the Law: The Constitution and the Family," 93 Harv.L.Rev. 1156, 1313 et seq. Section 453.030.1 RSMo (1978) directs that the approval of the court for an adoption "shall be given or withheld as the welfare of the person sought to be adopted may, in the opinion of the court, demand." The trial court, like Solomon [1] (see majority opinion, p. 532), after examining all the evidence, was convinced that it would be in the best interest of the children to grant this adoption. I believe that this conclusion was reasonable and supported by substantial evidence, and should therefore be affirmed.

In conclusion, I would note that it is difficult to see as a practical matter how denying this adoption would be beneficial to the interests of A.M. and M.M. Attempts to reconcile the children to their natural mother by judicial decree are not likely to

---

[1]. It should be noted that Solomon had the opportunity to 1) view and listen to the witnesses, 2) their demeanor and 3) judge their credibility. "And all Israel heard of the judgment which the king had judged, . . . , for they saw that the wisdom of God was in him, to do judgment." 1 Kings 3:28.

succeed. The record discloses that the children are adamantly opposed to having any contact whatsoever with their natural mother. This distressing fact is confirmed not only by the testimony of the custodial parents and the children themselves, but also by the unequivocal testimony of neutral parties, a social worker and a psychologist-psychoanalyst, each of whom had dealt with the children in relation to the "tumultuous" court-enforced visitation in 1978. Continuing litigation concerning visitation rights is likely to lead not to reconciliation, but only to increased resentment and bitterness between the children and their natural mother.

Further, an acceptance of the majority's second point will have a "chilling effect" upon the juvenile judges. I believe the trial judges, in this type of action, will be reluctant to make any fact finding determination because they will be suspect that we will substitute our fact finding determination for theirs. Secondly, I can forsee a multitude of appeals based upon the trial court's error of "finding of fact" and seek our interpretation of the facts.

I would affirm the decision of the trial court.