**In re Adoption of D.A.H., R.W.S. and S.L.S., Appellants,**

v.

**J.P.H., Respondent.**

**No. WD 37691.**

Missouri Court of Appeals, Western District.

Aug. 19, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 25, 1986.

William C. Partin and Matt Partin, Kansas City, for appellants.

Rickey L. Jeffries, Independence, for respondent; Paxton, Kerber, Halas, Jeffries & Mencl, of counsel.

Before BERREY, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

A petition for the adoption of D.A.H., who was born on September 3, 1971, by his natural mother, S.L.S., and her present husband, R.W.S., the child's stepfather, was denied by the Juvenile Division of the circuit court on October 24, 1985. The child's natural father is J.P.H., the marriage between him and D.A.H.'s mother was dissolved on April 25, 1975, with the custody of the child being awarded to the mother, with reasonable visitation rights to J.P.H., who was ordered to pay $80 per month to her for child support.

After the marriage dissolution, with the mother's encouragement, J.P.H. visited the child about twice a month from April, 1975 through the first months of 1976, and made the support payments during that time. S.L.S. was employed by an architectural/engineering firm during that time earning about $7,000 per year. The mother started seeing R.W.S. in early 1976, and they were married in 1977. In 1976, J.P.H.'s child support payments became sporadic but were made. But in January and February, 1977, no payments were made, and only $50 for March. There were some arguments between the mother and J.P.H. about child support, and in early 1977, before he left for Colorado (without telling S.L.S.), she asked him for support and he showed his attitude in stating to the effect that if R.W.S. wanted the responsibility, he could have it.

From 1977 through 1984, J.P.H.'s income, according to his answers to interrogatories, rose from $6,000 to $32,000 per year. No support payments were made by him from the March, 1977, $50 payment until April, 1984, when he tendered a $100 payment, not accepted by S.L.S. It should be noted that the support payments would have amounted to only $960 per year. During the latter part of these years, J.P.H. lived with a girlfriend, contributing to her townhouse payments $450 to $550 per month, and he acquired interests in skiing, fishing and camping, with attendant costs of equipment. The judge of the juvenile court remanded this case to the commissioner thereof for a further finding of neglect by J.P.H. The commissioner found, "For the vast majority of the eight years preceding the filing of this adoption, though able, the father met his own personal financial needs before providing any financial support for his son." It was further found that for the six month period preceding the filing of the petition, the father had the ability to pay the child support previously ordered, except for the $100 offered three weeks prior to filing of the petition, and concluded that there was clear, cogent and convincing evidence of his willful neglect of his financial obligation to his son. [The petition was filed under Subd. (4) of § 453.040, before that subdivision was deleted by the 1985 amendment of the section.]

During the time that appellants were going together, R.W.S. became involved in raising the child, and after they were married, he, as stepfather, assumed parental duties, providing all the varied services of a father to him: He encouraged and assisted him in baseball and other athletic events, attending those functions with him; he repaired the child's bicycle and other toys, took him to the doctor and dentist; and helped him in his school work and school activities. R.W.S. arranged his work schedules so as to be home when the child arrived from school. The coaches at baseball events thought that R.W.S. was the child's father because of their relationship. During this time, from 1977 to 1984, R.W.S. contributed income to the family's support, as well as meeting obligations to support his own child. It appears that both appellants have a total net income of over $3,000 monthly.

From early 1977 to 1984, J.P.H. had five visits with his son. The first, in 1978, was arranged by J.P.H.'s parents, who took the child to Colorado so they could supervise the visit as requested by appellants. The trip lasted a week, including travel time. There is no evidence of how

often or how long J.P.H. saw the child during that visit. A second visit occurred in the spring of 1981, when J.P.H. and friends came to Kansas City to see a Royals baseball game opener. Appellants cut short an Easter weekend visit to the Table Rock home of S.L.S.'s parents, and the child attended the game with J.P.H., who spent the rest of the day with his friends. Again, in 1982, the time spent by the child with his father consisted only of going to a Royals game with him and his friends. The fourth visit was either in the spring or summer of 1983, when J.P.H. accompanied friends to Kansas City. Appellants cut short the child's vacation with his maternal grandparents by a week so that J.P.H. could see the child. That visit consisted of a baseball game, a shopping outing and a fishing trip with perhaps some other excursions. The last visit was in November, 1983, when J.P.H. came to Kansas City for his grandmother's funeral. The child saw J.P.H. at the wake and for a short time after the funeral. There were occasional gifts sent to the child and some telephone calls. Although the contacts with the child were quite limited, and do not evince an interest of the father in establishing a close relationship with the child, it is unnecessary to rule the case upon that basis, although it is a factor. *Lambertus v. Santino,* 608 S.W.2d 502, 506 (Mo.App.1980).

Rather, this case turns upon the father's willful neglect substantially and continuously to provide him with necessary support, care and maintenance, having the ability to do so, for more than the six-month period prescribed by § 453.040(4). *In the case of Matter of Adoption of Pearson,* 612 S.W.2d 30 (Mo.App.1981), the court found a sufficient basis to affirm a decree of adoption because of the failure of the father to pay $30.00 per month decreed child support for more than a year prior to the filing of a new adoption petition, he having the ability to pay that modest amount. The court said, page 35[7], "Having determined that appellant willfully neglected to provide the children with proper care and maintenance, we need not explore the abandonment question. The statute is in the alternative and not in the conjunctive, and the finding of neglect is sufficient to dispense with the necessity of Steven's consent to the adoption, without regard to the question of abandonment." See and compare *In re Adoption of Baby Boy W.,* 701 S.W.2d 534, 543[7], and 545[12] (Mo. App.1985), and cases cited. J.P.H.'s neglect, his failure to support, is established here by clear, cogent and convincing evidence (as found by the trial court), and there exists, therefore, a valid ground to terminate his parental rights and to grant this adoption under the statute.

The next inquiry is whether this adoption will be in the best interests of the child, that is, his welfare. That is, of course, the paramount consideration in adoption proceedings. *R.F.N. v. G.R.,* 546 S.W.2d 510 (Mo.App.1976); *In re E.C.N.,* 517 S.W.2d 709 (Mo.App.1974). D.A.H., who was 13 years of age at the time of trial, has been in the custody of appellants since their marriage in 1977. The stepfather, R.W.S., has assumed parental responsibilities over him, and has aided him in school and athletic activities, as well as providing him with guidance and affection. Both have seen to his care and maintenance without any help from the natural father. The child had told appellants that it was agreeable to him that they adopt him. His feeling toward R.W.S. was like he was his dad, and appellants' daughter was like a sister to him. He stated to the court that he wanted to be adopted. His mother's position as a personnel manager required her to travel with some frequency, and she was concerned about the effect upon the child and R.W.S. if she were accidentally killed, and the child would be separated from him. Appellants wanted to put together and carry out planning for the child's future, which R.W.S. had already done for his daughter.

As in the *Pearson case,* supra, J.P.H. seems to be perfectly willing to allow appellants to provide all the necessities for D.A.H., to be responsible for his moral and spiritual welfare, while he contributes noth-

ing materially, his only interest being quite apparently in having an opportunity to see him occasionally. Also, as in the *Pearson case* (page 35), the evidence shows that appellants are properly raising the child, providing him with the necessities and comforts of a good home; that they are financially, morally and otherwise fully competent and capable of further rearing him in a positive and constructive manner; and that he is being given love and affection; and is happy and prospering in the appellants' home. Given the fact that the father has neglected this child (a fact found by the trial court), and the evidence that his welfare and future well-being would be best served if he were adopted, under circumstances where the father could not contribute to, this court is convinced that the judgment is against the weight of the evidence and is wrong.

There is no evidence here that appellants ever sought to cut off contact between the child and his father as was present in *Matter of Adoption of R.M.B.*, 645 S.W.2d 29 (Mo.App.1982); and *In re E.C.N.*, 517 S.W.2d 709 (Mo.App.1974). In fact, the contrary is true. Appellants always cooperated to allow visitation and other contacts between the two. Although appellants say that they would not cut off contacts in the future if requested, it is not necessary to address that matter. This child is now about 15 years old. He knows his father and his paternal grandparents. Certainly, he would have a say about future visits with his father and his paternal grandparents.

The judgment is reversed and the case is remanded with directions to enter a decree of adoption of D.A.H. by appellants as prayed.

All concur.